835 So.2d 441 (2003)
STATE of Louisiana
v.
Antoine WATTS.
No. 2000-KA-0602.
Supreme Court of Louisiana.
January 14, 2003.
*443 G. Benjamin Cohen, Kris N. Finley, Joseph William Pohlmann Hecker, Alan G. Rome, Baton Rouge, Clive Adrian Stafford Smith, New Orleans, Counsel for Applicant.
Richard P. Ieyoub, Attorney General, Scott M. Perrilloux, District Attorney, Donald J. Wall, Jr., Baton Rouge, Counsel for Respondent.
WEIMER, Justice.
The determinative issue in this appeal of a capital murder case is whether the trial court erred in denying defendant's motion for new trial based on newly discovered evidence. Finding the matter warrants such relief, we reverse and remand for a new trial.
On September 3, 1997, defendant Antoine Watts was arrested for the August 29, 1997 murder of Cecilia Colona, a 75-year-old resident of Tangipahoa Parish. A grand jury indicted defendant for violation of LSA-R.S. 14:30, first degree murder, on the basis that the killing was committed during the course of an aggravated burglary, or during the course of an armed robbery, and that the victim was over the age of 65.
On October 8, 1997, defendant pled not guilty. The matter went to trial two years later. After trial by jury, defendant was found guilty as charged on September 23, 1999. The death penalty was imposed on September 24, 1999, and on January 13, 2000, defendant was sentenced to death.

FACTS AND PROCEDURAL HISTORY
On August 29, 1997, at approximately noon, Nat Colona arrived home to find the bottom half of the glass door to his house had been removed. The wooden door, which his wife usually left open behind the glass, was closed. Colona looked through the small window in the wooden door, and noticed that his wife's rocking chair had been tipped over. He entered the house and found his wife's slippers strewn about, and the sofa looked as if it had been kicked. He called out his wife's name, but received no response. Colona grabbed the phone and called his office, as it was the first phone number that came to mind. He told the person who answered to call the police, which she did; she also notified the Colonas' son, Emile. In less than 10 minutes, Emile arrived at his parents' house. When Emile and Nat began looking around, they entered the master *444 bedroom where they found the deceased victim, Cecilia Colona.
Officer Mark Jones arrived on the scene next, and he kept a log of all persons entering and exiting the crime scene. He turned the case over to Detectives Dennis Pevey and Kevin Grob when they arrived shortly after him.
Jim Churchman of the Louisiana State Police Crime Laboratory examined the scene for physical evidence. He found a spent cartridge near the victim's body and a bullet lodged in the bedroom wall. He collected gunpowder residue from the victim's face and examined the bullet that had killed the victim, which he later determined to be a nine millimeter bullet. Churchman reasoned that the abrasion ring on the victim's face indicated that the perpetrator shot the victim by placing the gun to her forehead and firing. Although Churchman found very little ransacking, the victim's purse and its contents had been rifled; a set of car keys was in the victim's hand.
Churchman photographed a shoe print, which he found on the kitchen floor. During the course of his investigation, Detective Pevey delivered the pictures of the shoe print to Officer Wayne Scivicque. Scivicque went to a local sporting goods store and determined that the footprint in the victim's kitchen was from a Nike Air Max Tailwind II shoe.
On September 4, 1997, Detective Pevey received a tip that the defendant and Anthony Spears were involved in killing Cecilia Colona. The defendant had been taken into police custody the previous day on an unrelated burglary charge; after the tip, police also arrested Spears as a suspect in the Colona murder.
In the early morning hours of September 5, 1997, defendant gave a statement. He told police that on the morning of the killing, Spears arrived at his house and the two of them entered the Colona residence together. The defendant stated that Spears pulled out a gun as the two of them entered the residence. The defendant went into the kitchen, while Spears went the other direction, farther into the house. The victim surprised defendant, and defendant told Spears that he wanted to leave; Spears wanted to stay and force the woman to take them to a bank. While the defendant waited at the back door, he heard a commotion in the bedroom and then a gunshot; defendant ran from the residence.
Subsequently, defendant gave another recorded statement to police, in which he mentioned only his participation in the killing. He again claimed that the victim surprised him. However, this time he stated that while he was telling her to move, the gun "just went off." Defendant further stated that he did not know how the victim got on the floor.
Detective Glenn Hauck, who was also working on the case, claimed defendant made a similar statement to him while the two were alone in a police car. Police had already determined that Nike Air Max shoes matching the print found in the victim's kitchen had been stolen in a recent burglary of a store. Defendant had stolen the murder weapon a few days before the killing. Police obtained the murder weapon from Chuckie Gibson, who had bought it from Anthony Spears.
After the grand jury indictment for the first degree murder of Cecilia Colona, defendant filed various pretrial motions, including a motion to suppress. On November 20, 1998, the district court held a suppression hearing, and a hearing to determine the admissibility of "other crimes" evidence under State v. Prieur, 277 So.2d 126, 130 (La.1973). Although the court found the restrictive conditions of defendant's *445 confinement "bothersome,"[1] the court ruled all statements admissible, finding that they were given freely and voluntarily. The court also found admissible evidence of two of defendant's un-adjudicated burglaries, the one in which he took the murder weapon and the one in which he took the Nike Air Max shoes.
On August 18, 1999, defendant attempted to plead guilty to non-capital first degree murder. However, during the guilty plea colloquy, counsel informed the district court that despite his best efforts to convince defendant to plead, defendant had reservations and wished to stand trial. On September 14, 1999, trial began.
At trial, the State introduced the evidence mentioned above. Crucial to the State's case was the testimony of Anthony Spears, who admitted that he was originally a suspect in the murder investigation and that he was testifying pursuant to a plea agreement. Denying that he had ever been in the Colona residence, Spears claimed defendant confessed to him that he had killed the victim. However, Spears admitted to participating in a burglary with defendant, the one at the store where he and defendant each procured a pair of Nike Air Max shoes. Spears stated he pled guilty to simple burglary for that incident, as well as obstruction of justice and possession of cocaine, and that the district court sentenced him to terms totaling four years imprisonment at hard labor.[2] While testifying at defendant's trial, Spears repeatedly stated that he was telling the truth, as it was a requirement of his plea bargain.
For the defense, Charles "Boo" Chaney testified that Spears, and not the defendant, had confessed to him. Further, defendant testified consistently with his first taped statement, specifically, that he got no further than the victim's kitchen when he heard Spears fire a shot. He further stated that he was coerced into the second recorded statement, and that he was never alone with Detective Hauck. Defendant's wife testified that she was in the police car with defendant and Hauck at the time, according to Hauck, that defendant confessed. The jury evidently found defendant's version of events unconvincing, as it found him guilty of first degree murder.
After the penalty phase of the trial, the jury determined defendant should be sentenced to death.
The motion for new trial[3] we now consider was filed when defendant obtained information about new evidence. Post trial, during a heated exchange, Spears stated to Steve Jackson, a security guard at an apartment complex, that he had "killed that old white lady." A few days later, Spears met with Jackson and apologized for the exchange. When Jackson, a former sheriff's deputy, warned Spears about admitting that he had killed someone, Spears brushed off such warnings saying that he was not worried because he had already served time on charges related to the murder, and thus, in his view, double jeopardy barred his prosecution.
*446 Defendant's motion for new trial based on newly discovered evidence was summarily denied by the trial court. This court eventually remanded the matter for a hearing. At the April 18, 2001 hearing, the State argued that Spears's statement was made during a heated argument. The State did not explain why Spears refused to recant when he met with Jackson a few days later.
The district court again denied the motion without reasons. Pursuant to an order by this court, the district court then filed written reasons for the denial on November 27, 2002. The court listed what it labeled as "findings of fact":
1. Jackson was a neutral, independent, and unbiased witness who had no apparent motivation to lie.
2. The event occurred after trial and truly fits the legal description of "newly discovered evidence."
3. If I were sitting as the "thirteenth juror" on the case I would believe that the statement was made.
4. The statement would not have persuaded me to change my vote of guilty or my vote for death, because it was merely the brash statement of a common street criminal who wished to elevate his reputation for violence in order to create fear and intimidation. This is especially true since he was obviously under the influence of drugs or alcohol at the time the alleged statements were made.
5. The evidence of the guilt of Watts was overwhelming at the trial, and no reasonable juror would be swayed by this "new" evidence, especially since the testimony of Charles Chaney was heard in full and considered by the jury. Personally, I do not doubt that the statement to Chaney was in fact made, but simply rejected by the jury as street talk bravado similar to the statement made to Jackson after the trial.
6. Watts confessed to the crime in great detail on several occasions under circumstances which were voluntary and unsolicited. There was no evidence that any of the statements were coerced in any fashion or non-voluntary.[4]
After the denial of his motion for new trial, defendant pursued the instant appeal.

DISCUSSION
In his most recent motion for a new trial, defendant asserted that Anthony Spears's post-trial confession to Jackson that he, and not the defendant, killed the victim, entitles defendant to a new trial. We agree.
Grounds for seeking a new trial are set forth in LSA-C.Cr. P. art. 851. That article provides in pertinent part:
The court, on motion of the defendant, shall grant a new trial whenever:

*447 . . . .
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty.
Thus, a new trial shall be granted based on Article 851(3) when: (1) new evidence was discovered after trial; (2) the new evidence is material; (3) the failure to discover the evidence was not due to a lack of diligence on the part of the defense; and, (4) had the evidence been introduced, the verdict or judgment of guilty probably would have been changed. See State v. Cavalier, 96-3052, 97-0103, p. 3 (La.10/31/97), 701 So.2d 949, 951; State v. Hammons, 597 So.2d 990, 994 (La.1992); State v. Knapper, 555 So.2d 1335, 1339 (La.1990).
In State v. Talbot, 408 So.2d 861, 885 (La.1980) (on rehearing), Justice Dennis explained:
The scope of the trial judge's duty toward the motion for a new trial based upon the new evidence must be kept in mind. It was not for him to determine the guilt of [another alleged suspect] or the innocence of [the defendant]; it was not for him to weight the new evidence as though he were a jury, determining what is true and what is false. The judge's duty was the very narrow one of ascertaining whether there was new material fit for a new jury's judgment. If so, will honest minds, capable of dealing with evidence, probably reach a different conclusion, because of the new evidence, from that of the first jury? Do the new facts raise debatable issues?[5] Will another jury, conscious of its oath and conscientiously obedient to it, probably reach a verdict contrary to the one that was reached on a record wholly different from the present, in view of evidence recently discovered and not adducible by the defense at the time of the original trial?
The test is objective in that the trial judge does not sit as the ultimate arbiter of the resolution of the case once the new evidence is considered, that is, the trial court does not weigh the evidence. The role of the trial court is to review the evidence constituting the State's case, not to determine the sufficiency of the evidence, but to evaluate the effect of the newly discovered evidence.[6]Hammons, 597 So.2d at 998.
As an initial matter in the instant case, the State concedes defendant has met the first three requirements of LSA-C.Cr.P. art. 851(3). Spears confessed to Jackson in the late summer or early fall of 2000, almost a year after defendant's trial. Thus, the evidence was new and obviously defendant had no opportunity to discover the confession prior to trial, as the confession *448 was made after the trial. Further, the confession is material to the case, as it involves the identity of the victim's killer. Thus, the State's sole contention is that the new evidence would not lead a new jury to reach a different conclusion.
At the hearing on defendant's motion for new trial, Jackson explained that his brother and Spears's mother had dated for several years, causing Jackson to consider himself "like an uncle" to Spears. Jackson, a former sheriff's deputy, testified that during the late summer or early fall of 2000, while working as a security guard at an apartment complex, he received word that Anthony Spears was involved in a heated argument with three other people. Jackson told those arguing to leave the premises, and all but Spears complied. When Spears attempted to enter one of the apartment buildings, Jackson stopped him, and he began to curse. Jackson warned Spears that he would call the police, and Spears threatened to beat Jackson. Jackson told Spears not to "go that route" with him, but Spears lunged at Jackson nevertheless. Jackson hit Spears as he lunged and knocked him down. Spears then got up and said that he was going to get his gun and that "[w]hen I come back I'm gonna kill you like I killed that old white lady." Jackson then called police, who were unable to apprehend Spears.
A few days later, Spears returned to the apartment complex and apologized to Jackson. Jackson brought up Spears's statement regarding the killing, warning him about admitting such a matter. Nevertheless, Spears told Jackson that he was not worried because he had already served time on charges related to the murder; thus, in his view, double jeopardy barred his prosecution. Jackson further testified that on the night of the confrontation, Spears was acting "way out there" and that he probably would have made good on his threat to return with his gun had police not arrived. [Id.] On cross examination, Jackson added that Spears had threatened to kill him the night before the confrontation described above, but admitted that Spears had not acted on his earlier threat.
The trial court found Jackson remarkably creditable, due in part, no doubt, to the fact that Jackson was a former deputy sheriff who considered himself "like an uncle" to Spears. The trial judge believed that Spears told Jackson he (Spears) would kill Jackson "like I killed that old white lady." Thus, although the trial judge believed Jackson, the trial judge did not believe that Jackson was told the truth by Spears. The trial judge found Spears, an initial suspect in the murder investigation,[7] to be untruthful.
When ruling on an Article 851(3) motion, a trial judge's duty is not to weigh the new evidence as though he were a jury deciding guilt or innocence or to determine what is true or false in light of the additional information. In other words, the trial judge is not to assess the newly discovered evidence as though he were a thirteenth juror.[8] Under Talbot, 408 So.2d *449 861, the trial judge should not weigh the new evidence as if he or she were a jury deciding guilt or innocence (or in this case, whether or not to impose the death penalty) but should ascertain whether there is new material fit for a new jury's judgment. The only issue is whether the result will probably be different.[9]
Contrary to these principles, the trial judge in the instant case stated specifically that he was evaluating the new evidence as a thirteenth juror. Thus, the trial judge fell into legal error.[10]
Reviewing the new evidence by the proper standard, this court concludes the *450 new evidence probably would have led a new jury to a different result, at least in the penalty phase of the proceedings.
In support of its position, the State argues that Spears made the admission in question during the course of a heated argument "to make himself seem even badder" and that the statement does not call into question defendant's guilt. The State further claims that "the statement made by Anthony Spears amounts to nothing more than bragging." Had Spears only made inculpatory remarks during the course of his heated encounter with Jackson, such argument might be persuasive. However, as mentioned above, Jackson testified that even once tempers had cooled, days after the heated confrontation, Spears did not deny killing the victim. Instead, Spears expressed his belief that he could not be prosecuted for his action. Accordingly, the circumstances do not support the State's contention or the trial court's factual finding that Spears's statement was mere braggadocio.
Further evidence supports the defendant's contention that Spears's confession would have influenced the verdict. At trial, the State based a significant portion of its case on Spears's testimony. Spears testified that on the night of the murder:
[Defendant] came to me. He told me that he needed to talk. I stepped outside. He told me that he shot a lady. An old lady. And he told me that he went to this house, demanded money. And lady say she didn't have no money. So he tried to take her to the bank. And she say she didn't know her bank number card. So took her in her room, put her on her knees and he shot her.
Spears also testified that initially defendant only admitted that he shot the victim because she had surprised him. He explained that defendant told him that he shot the victim because she had no money. Spears then testified that defendant gave him the murder weapon, which he sold to Chuckie Gibson. On cross examination, Spears claimed that before trial he and the District Attorney had talked "about just me coming and telling the truth. And he was telling me if I lie, that the deal is off." Spears then said that he had never been to the victim's house. Spears concluded his testimony by repeating that he was telling the truth, while reminding the jury that if he did not tell the truth, he would go to trial on the charges to which he had pled guilty.
During closing argument, the State placed great weight on Spears's testimony, stating:
You know what else my daddy told me? An honest man cannot tell a lie. Now a liar every now and then will tell the truth. I'm not asking you to believe him. I'm asking you to consider whether or not you believe him. That's your job. You listened to his testimony. And you decide if Anthony Spears is telling you the truth. I'll tell you this, I made a deal with him. Made him sign this form. I made him discuss it with his lawyer. And if he doesn't abide by this form, I can revoke his deal. And, you know, what's the first thing I told him he's got to do in his deal; answer any question put forth to you by any law enforcement officer. Not about this case. Not anything. Anything at all. He has to tell the truth. Period. If he doesn't tell the truth. No deal. That's all I told him. That's all I want.
The State also sought to discredit the testimony of Charles "Boo" Chaney. Chaney testified that on the night of the murder, he and Spears had attended a wedding reception. At the reception, Spears pulled his friend Chaney aside and admitted to him, through tears, that he had shot an old lady. Specifically, Spears stated that he *451 "told her to get on her knees and look at him. And shot her in the face." The prosecutor attempted to discredit Chaney's claim during closing argument, stating:
Charles Chaney. Charles Boo Chaney, convicted murderer.[11] Murderer. I didn't call Charles Chaney. Wouldn't call him. He's trash. Don't trust him. Don't like him. Wouldn't believe a word he said. He's a convicted murderer. But you heard him, and you're going to have to make that decision.
Spears's confession to Jackson casts doubt on the above quoted testimony and argument submitted by the State. The person Spears confessed to after the trial, Jackson, had no particular interest in the case. Unlike Chaney, Jackson was neither a convicted felon nor someone who had a possible grudge against Spears.[12] Instead, he is a former police officer.
Likewise, Spears's admission is bolstered by the fact that it corroborates the defendant's first recorded statement to police. In that statement, the defendant told police that on the morning of the killing, he and Anthony Spears went to the Colona residence together; that as they entered the house, Spears pulled out a gun; that he went into the kitchen, while Spears went in the other direction, farther into the house; that when the victim surprised him, he wanted to leave, but Spears wanted to stay and force the woman to take them to a bank; and that while he waited at the back door, he heard a commotion in the bedroom, then a gunshot, and then he ran.
Spears's admission also casts doubt on defendant's second recorded statement to police, as well as Detective Hauck's testimony that defendant admitted to the shooting while he and Hauck were riding unaccompanied in a police car, searching for evidence. In defendant's second recorded statement, curiously, he did not know "how the victim got on her knees." Such a lack of knowledge is more consistent with the events admitted to by Spears[13] and with defendant's first recorded admission to police than with any admission that he shot the victim. As to the unrecorded statement, a defense witness testified that she was in the police car with the defendant, another officer, and Detective Hauck, and that defendant did not make the comments which Hauck testified he had made.
Likewise, the physical evidence supports an inference that Spears and not defendant actually killed the victim. The shoe print was found in the kitchen, not the bedroom. Thus, if one concludes the print was defendant's,[14] his original recorded statement to police that he stayed in the kitchen is corroborated. Further, although defendant admitted to taking the murder weapon days before the shooting, he testified that he sold it to Spears before the day of the murder. Police obtained *452 the murder weapon from a third party who bought the gun from Spears after the shooting.
Because Spears's statement that he committed the murder is corroborated by the physical evidence related to the shoe print, by Chaney's testimony, and by defendant's first statement, it is also admissible evidence under LSA-C.E. art. 804(B)(3).[15] Under this article, a statement tending to expose the declarant to criminal liability and to exculpate the accused is admissible when corroborating circumstances clearly indicate the trustworthiness of the statement. Hammons, 597 So.2d at 996.
Accordingly, Spears's admission to Jackson that he "killed that old white lady" and his failure to deviate from the admission when confronted indicate that another jury presented with all of the evidence would probably have reached a different result, especially in the penalty phase of the trial, a matter to which the trial court gave only cursory consideration. See, Hammons, 597 So.2d at 998; Knapper, 555 So.2d at 1339.
The new evidence will also interject the issue of whether defendant or Spears was the triggerman, which remains a pertinent inquiry despite the fact that this court recently rejected the argument that a defendant who did not "pull the trigger" cannot be sentenced to death. See State v. Anthony, 98-0406, pp. 13-14 (La.4/11/00), 776 So.2d 376, 386 (the State is not required to show that defendant actually pulled the trigger.) The State's burden is to prove that defendant acted in concert with his co-perpetrator, that defendant had the specific intent to kill, and that one of the aggravating elements enumerated in LSA-R.S. 14:30 was present. Id.[16]

CONCLUSION
Appeal of the instant case presents this court with one meritorious argument. At trial, the State based a significant portion of its case on the testimony of Anthony Spears, the truthfulness of which has been made questionable by Spears's later actions. After trial, Spears, an initial suspect, stated to Jackson, a former deputy sheriff, that he [Spears] had killed the victim. When given the chance to recant, Spears did not, stating he was protected by a double jeopardy bar to prosecution. Spears's admission is bolstered by the fact that he sold the murder weapon soon after the killing; that the admission is consistent with the defendant's first recorded *453 statement to police; and that Spears had knowledge of the details of the killing that defendant denied having when he gave his second statement to police.
Accordingly, Spears's admission to Jackson that he "killed that old white lady" and his failure to deviate from the admission when confronted indicate that another jury presented with all of the evidence would probably have reached a different result either in the guilt or the penalty phase of the new trial.
It is appropriate to be skeptical when newly discovered evidence is offered after a trial.[17] Such evidence must be thoroughly and cautiously scrutinized. The finality of judgments is an important judicial and societal goal. Those who have been victimized and the families of those who have been victimized desire closure, especially in a brutal and senseless crime against an innocent victim. However, this newly discovered evidence puts at issue the degree of culpability and whether the death penalty is the appropriate sentence based on the newly discovered evidence. That determination must be made based on an evaluation of all of the evidence by a jury.
CONVICTION AND SENTENCE VACATED; CASE REMANDED FOR NEW TRIAL.
VICTORY and TRAYLOR, JJ., dissents and assigns reasons.
VICTORY, J., dissenting.
I dissent from the majority's reversal of defendant's conviction and sentence and remand of the case for a new trial on the basis of "newly discovered evidence." Not only does the evidence at issue not meet the requirements for a new trial under La.C.Cr.P. art. 851(3), it is not even admissible as a statement against interest under La. C. Evid. art. 804(B)(3).
Under La. C.Evid. Art. 804(B)(3), a statement against interest is admissible as an exception to the hearsay. Commentators have explained the reason for this exception as follows:
The trustworthiness that generally lies at the basis of this exception to the hearsay rule derives from the circumstance that rarely does a person knowingly lie to his disadvantage. It is a common sense observation that if at the time a statement is made a person believes that his patrimony or liberty is hurt by the facts asserted in such a statement, he generally will not make the statement unless he believes the facts asserted therein to be true.
George W. Pugh, Robert Force, Gerard A. Rault, Jr., and Kerry Triche, Handbook on Louisiana Evidence Law (West 2002). In this case, at the time Spears allegedly made the statement to Jackson that "I'm going to kill you just like I killed that old white lady," he erroneously believed that he was in no danger of losing his liberty as a result of making the statement. Thus, all indices of trustworthiness are gone and the statement is not admissible as an exception to the hearsay rule.
Further, the legislators were careful to address the inherent dangers of "statements against interest" which exculpate *454 the accused by strictly limiting their admissibility under Article 804(B)(3) as follows: "A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." La. C. Evid. Art. 804(B)(3). Here, Spears' statement is not admissible because corroborating circumstances do not "clearly indicate the trustworthiness of the statement." La. C.Evid. art. 804(B)(3).
The majority reasons that the statement is admissible because it is "corroborated by the physical evidence related to the shoe print, by Chaney's testimony, and by defendant's first statement, ..." 835 So.2d at 452. In defendant's first statement, he told the police that he stayed in the kitchen while Spears and Charles Chaney shot the victim elsewhere in the home. In fact, Chaney was arrested and questioned about this crime based on defendant's first statement. However, defendant's first statement was clearly rejected by the jury, who obviously believed defendant's second recorded statement that he alone shot the victim and that he only named Spears and Chaney in the first statement because he felt that they had ratted him out.[1] In addition, far from corroborating Spears' statement to Jackson, the fact that defendant's shoe print was found in the house, albeit in the kitchen, clearly places defendant at the scene of the crime. On the other hand, no physical evidence whatsoever linked Spears to the crime scene. The jury also heard that defendant also confessed on two separate occasions to Detective Kevin Glob and Officer Glenn Houck, telling each of them that he went into the home alone to burglarize the home, was surprised to find the victim home, led her into the bedroom and accidently shot her. Likewise, the jury rejected the statement of Chaney, a convicted murderer who was also shown to be biased against Spears because they both dated the mother of Spears' child at the same time, that Spears admitted to him that he shot the victim. However, in spite of the fact that the jury, and the trial judge in his reasons for denying defendant's motion for a new trial, clearly rejected defendant's first statement and Chaney's testimony, the majority finds these statements to be the "corroborating circumstances [which] clearly indicate the trustworthiness of the statement." I strongly disagree.
Further, the statement is not grounds for a new trial under the "newly discovered evidence" provision of La.C.Cr.P. art. 851(3). In, State v. Jacobs, 99-991 (La.5/15/01), 803 So.2d 933, the defendant presented the defense at trial that he was not the triggerman and argued to the jury that the state's evidence did not exclude the reasonable hypothesis that a third person was the murderer. After the defendant's conviction, Davis (the owner of the getaway car) implicated a third person as the shooter. This Court held that "while Davis' testimony possibly may have aided the defendant's case it was not indispensable to the third party gunman defense, which was presented principally to challenge the sufficiency of the state's evidence." Further, the Court found that the evidence did not meet the criteria of Art. 851(3) because "[c]ourts treat with great skepticism belated exculpatory evidence provided by co-defendants who have resolved their own cases after the defendant's conviction." "Generally such evidence is not a sufficient ground for granting a new trial." "In the present case, the third party gunman theory was known, presented as evidence, and argued to the *455 jury at defendant's trial, and the defense knew that Davis could have provided evidence on this issue." Likewise, in this case, the theory that Spears was the killer was known, presented as evidence, and argued to the jury at defendant's trial. Evidence that Spears was the killer was thus not "newly discovered evidence."
Further, "[n]ewly discovered evidence affecting only a witness's credibility `ordinarily will not support a motion for a new trial, because new evidence which is `merely cumulative or impeaching' is not, according to the often-repeated statement of the courts' an adequate basis for the grant of a new trial." State v. Cavalier, 96-3052 (La.10/31/97), 701 So.2d 949 (citing Mesarosh v. United States, 352 U.S. 1, 9, 77 S.Ct. 1, 5, 1 L.Ed.2d 1, 5 (1956)).
In my view, the jury clearly convicted defendant of first degree murder and sentenced him to death because he confessed to the police on three separate occasions that he alone committed this crime. Further, in his second recorded statement to the police, he admitted that he only named Spears and Chaney as being involved in the crime because he felt they had ratted him out. In my view, the majority mistakenly orders a new trial based on evidence that is neither "newly discovered," nor even admissible.
For all of the reasons, I respectfully dissent.
TRAYLOR, J., dissenting.
I dissent from the majority for the reasons assigned by Justice Victory.
NOTES
[1] See n. 2, infra.
[2] Apparently, Spears had not been sentenced prior to defendant's trial, because the prosecutor stated in closing argument that the plea bargain could be rescinded if Spears did not tell the truth. See discussion, infra. At the time of defendant's trial, Spears was incarcerated, but he testified he was due to be released immediately following the trial.
[3] Defendant's first motion for new trial concerned alleged communication between the alternate juror and the 12 members of the jury after the guilt-phase verdict. In light of our disposition of the case, it is unnecessary to address the disposition of that motion.
[4] We note that although the trial court denied defendant's motion to suppress the confessions, the court found some circumstances of defendant's being held for interrogation to be "unusual" and "very bothersome." As to the length of interrogation, defendant testified at the hearing on the motion to suppress that he accompanied police to the station for questioning on September 3, 1997, at around 11:00 a.m. Police placed him in a small room and began questioning him, not allowing him to leave until after he made a taped statement on September 5 at 1:55 a.m. After defendant's first statement, police transported him to the Tangipahoa Parish Prison, where he arrived at 6:26 p.m. on September 5, 1997.

When setting out his grievances, defendant mentioned only that police did not let him call anyone or talk with anyone. Nevertheless, defendant signed several waiver of rights forms, and the chief of police, as well as at least one detective, testified that defendant gave his statement freely and voluntarily, and was not coerced.
[5] These concepts concerning the scope of the trial court's duty toward the motion for new trial based on newly discovered evidence have withstood the test of time, having been stated, almost verbatim, by United States Supreme Court Justice Felix Frankfurter over 70 years ago. See Felix Frankfurter, The Case of Sacco and Vanzetti: a critical analysis for lawyers and layman, 103 (1927). Although the concepts are time-honored, the question of whether the new facts raise debatable issues cannot be considered in isolation; rather, the question must be considered in light of the Article 851(3) provision that the new facts would probably have changed the result reached by the first jury.
[6] The State's evidence at trial is considered because if the evidence of guilt contains significant contradictions and discrepancies, newly discovered evidence of relatively minor importance might be sufficient to create a reasonable doubt. Hammons, 597 So.2d at 998.
[7] Additionally, the trial court noted defendant confessed a number of times. However, defendant was held incommunicado for a day and a half, a situation the trial judge referred to as "unusual" and "very bothersome" at a prior proceeding. Also, Spears, an initial suspect, had the gun after the crime; this fact is equally as significant as the fact that defendant procured the gun in a burglary a few days prior to the murder.
[8] It is appropriate for the trial court to act as a juror for other grounds related to a motion for new trial, but not if newly discovered evidence is the ground on which the motion is based. The State conceded this point at oral argument. Trial courts are to use the thirteenth-juror standard when the asserted ground in the motion for new trial is not newly discovered evidence, but is another ground stated in Article 851, such as a verdict being contrary to the law and the evidence or the court being of the opinion that the ends of justice would best be served by granting a new trial. See State v. King, 96-1303, p. 4 (La.App. 3 Cir. 4/2/97), 692 So.2d 1296, 1299.

A trial judge who sits as a thirteenth juror is asking what the jury has actually done. Was the verdict contrary to the law? Was the verdict contrary to the evidence? Does the verdict fall short of serving the best interests of justice? This inquiry focuses on the result in that if the answer to one or more of these questions is "yes," then the result should not stand.
Compare a trial judge who determines an Article 851(3) motion for new trial based on newly discovered evidence: the judge is asking what the effect of the newly discovered evidence will be. The question is hypothetical: if a new jury hears the case with the newly discovered evidence included, will the verdict be different from that of the first jury? Confining the question to the exact wording of the statute"if the evidence had been introduced at the trial ... would [it] probably have changed the verdict or judgment of guilty[?]"is conceptually challenging, at best. The difficulty lies in the fact that the newly discovered evidence, such as the evidence we encounter in the instant case, is likely to change the whole dynamics of the trial; the new trial will be different from the previous trial. Thus, it is easier to conceptualize the task of making this determination by considering the question in terms of two juries, such as the jurisprudence has done consistently since this court paraphrased Justice Frankfurter's statement of the inquiry in Talbot. See State v. Brisban, XXXX-XXXX, p. 12 (La.2/26/02), 809 So.2d 923, 931; State v. Bright, 98-0398, p. 26 (La.4/11/00), 776 So.2d 1134, 1149; State v. Prudholm, 446 So.2d 729, 735-736 (La.1984).
[9] The trial court's evaluation of the newly discovered evidence becomes more complicated in a death penalty case in which the jury determines not only guilt but also the penalty, which must be imposed by a unanimous verdict. See LSA-R.S. 14:30, Reporter's Comment. Although the cases decided under the statutory provision mention probably changing the verdict of guilty, in a case such as the instant one, not only the guilt but also the death penalty may be changed. Succinctly stated, the determination is whether the new evidence probably interjects an element of reasonable doubt either as to the guilt phase or as to the penalty phase of the trial. Thus, the court must determine if the new jury will probably find defendant not guilty, guilty as charged but not subject to the death penalty, or guilty of a lesser charge.
[10] "In reviewing questions of law, appellate courts usually follow an approach that is brutally simple or simply brutal (depending on whether the process is being evaluated by the trial judge or an observer less intimately concerned). The appellate courts merely ask themselves whether they agree with the trial judge's resolution of the legal issue. If not, they reverse." Rosenberg, Judicial Discretion of the Trial Court, Viewed from Above, 22 Syracuse L.Rev. 635, 646 (1971). But see, Talbot, 408 So.2d at 885, where Justice Dennis, on rehearing, observed that although there is no appellate review of a trial court's granting or refusal to grant a new trial, except for error of law, an abuse of the trial court's discretion on the ground of newly discovered evidence has been regarded as presenting a question of law. However, Justice Dennis followed the statement with the caveat that great weight must be attached to the exercise of the trial judge's discretion, which should not be disturbed on review if reasonable men could differ as to the propriety of the trial court's action.
[11] Chaney testified that he had been convicted of, inter alia, manslaughter.
[12] The State urged the proposition that Chaney's testimony concerning Spears's confession to him was prompted by the fact that the mother of Spears's child was Chaney's former girlfriend. Chaney denied any animosity toward Spears for that reason, stating both men had been intimate with her during the same time period. Further, we note that in the trial court's per curium, the judge stated he believed Chaney's testimony that Spears had told Chaney he [Spears] was the killer. Although the trial court dismissed Spears's statement to Chaney as street talk bravado, Chaney stated Spears was in tears when he made the statement.
[13] It was Spears who related the detail of the victim being on her knees when she was shot.
[14] We note Spears admitted he was also involved in the burglary with the defendant in which shoes were stolen.
[15] Further, the State did not make a hearsay objection at the hearing, but admitted that the statement by Spears to Jackson is relevant and satisfies the first three requirements of newly discovered evidence. See Cavalier, 97-0103 at 3, 701 So.2d at 951.
[16] Under Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), the death penalty does not violate the Eighth Amendment in the case of a defendant who participates in a felony, which results in murder, if the defendant's participation is "major" and "the defendant has a mental element of reckless indifference." Tison, 481 U.S. at 157-158, 107 S.Ct. at 1688. But see State v. Sonnier, 380 So.2d 1, 8 (La.1979), in which this court held that defendant's "minor" participation in the murders was a sufficient mitigating circumstance to bar imposition of the death penalty. Further, even more recent than this court's decision in Anthony was the acknowledgment by this court in State v. Louviere, 2000-2085 (La.9/4/02), 833 So.2d 885, 899, n. 15, that the issue of moral culpability remains one of the significant issues in capital sentencing. In Atkins v. Virginia, 536 U.S. 304, 312-13, 122 S.Ct. 2242, 2247, 153 L.Ed.2d 335 (2002), the United States Supreme Court noted that for purposes of imposing the death penalty, a defendant's criminal culpability must be limited by the extent of his participation in the crime; his punishment must be tailored to his personal responsibility and moral guilt.
[17] We note that courts generally treat with "great skepticism" belated exculpatory evidence provided by co-defendants who have resolved their own cases after the defendant's conviction. Such evidence is usually not sufficient to warrant a new trial. State v. Jacobs, 99-0991, p. 18 (La.5/15/01), 803 So.2d 933, 947. For discussion of after-trial statement, see, State v. Mince, 97-2947 (La.5/29/98), 714 So.2d 684. However, in the instant case, the statement by Spears was not only exculpatory of the defendant but was also against Spears's criminal interest, a fact that makes the usual "great skepticism" inappropriate.
[1] In fact, Spears and defendant were arrested based on Chaney's unsolicited tip to the police that Spears and defendant had murdered the victim.