959 So.2d 465 (2007)
STATE of Louisiana
v.
Jennifer COLEMAN.
No. 2005-K-1617.
Supreme Court of Louisiana.
June 29, 2007.
*466 Charles C. Foti, Jr., Attorney General, Julie E. Cullen, Assistant Attorney General, Camille A. Morvant, II, District Attorney, for applicant.
Christopher Albert Aberle, Mandeville, Louisiana Appellate Project, Sherry Watters, for respondent.
CALOGERO, Chief Justice.[*]
In this case, we apply the standard for granting a new trial in a criminal matter based on newly discovered evidence and conclude the trial judge did not abuse his discretion in denying the defendant's motion for new trial. For the reasons set forth below, we vacate the court of appeal's decision, which reversed the defendant's convictions for aggravated second degree battery and second degree kidnapping, and we remand the case to the court of appeal for consideration of the defendant's remaining assignment of error.
FACTS and PROCEDURAL HISTORY
In May 2001, the victim, Frank Bayonne,[1] drifted from Natchitoches to Thibodaux and began "hanging around" the defendant's neighborhood. Believing that Bayonne had broken into her apartment and stolen some of her belongings, the defendant, Jennifer Coleman, made a report to the police on May 25, 2001, at approximately 8:16 p.m. Thereafter, one of the defendant's neighbors saw Bayonne exit the defendant's apartment and walk down an alley. The defendant called the police, and then grabbed an aluminum bat with which to confront Bayonnne. In the presence of three of her girlfriends, the defendant swung the bat at Bayonne, hitting him in the legs. Her second swing struck a brick building. Bayonne, unarmed, promised to return the defendant's property and fled to a nearby convenience store.
At the defendant's request, two acquaintances, Anthony Ayrow and Derrick Adams, forced the victim out of the convenience store to the parking lot, where a *467 crowd of people had gathered.[2] The store's security camera showed the two men forcibly taking the unarmed victim out of the store; the defendant waited outside the store yelling that she wanted her property back, "I'm going to get you," and "I'm going to kill you." Different people attacked the victim, including one of the defendant's neighbors who hit him with a tree branch,[3] and another man kicked him. Though at trial she denied having done so, the defendant was seen hitting the fallen victim in the head with the baseball bat she had carried with her. The defendant and her friends then left the scene. As she placed the baseball bat in the trunk of the car, the defendant told one of her girlfriends that she "beat his ass."
At 8:41 p.m., during the altercation in the parking lot, the owner of the convenience store called the police and reported the fight. Officers arrived promptly, but the fight was over, and the victim was standing in the parking lot with no apparent injuries. Bayonne told the officers that he had not been in a fight. The police questioned the defendant, who also made no mention of the attack on the victim but instead reported that the victim had broken into her house. Not realizing Bayonne had been seriously injured, the police arrested him for burglary of the defendant's apartment and transported him to the police station.
After viewing the store's videotapes and interviewing the various witnesses at the store, the police learned the defendant had been involved in the fight and had used a baseball bat to beat the victim. The defendant consented to a search of her car's trunk where the police found the bat.
Meanwhile, the victim was placed in the holding cell at the police station at approximately 8:52 p.m. Within about 15 minutes, the victim became uncommunicative and collapsed. An ambulance was called at 9:10 p.m., and the victim was transported to the hospital. He was semi-conscious upon arrival at 9:53 p.m., or just about one hour and a quarter after the beating he had sustained in the convenience store parking lot, and he was "deeply comatose" when examined by Dr. Thomas Donner, the attending neurosurgeon, shortly thereafter. The critical nature of the victim's condition was obvious to Dr. Donner. After an immediate CAT scan revealed that the victim had a large subdural hematoma on the left side of his brain, the doctor rushed him into surgery. The victim survived brain surgery, but remained in a comatose state. For months thereafter he resided in a nursing home, unable to walk, feed himself, talk, or dress himself. He was paralyzed on the right side of his body, and his arms and legs were drawn. The victim eventually died in 2006.
Prosecution commenced in 2001 when the state charged the defendant with attempted first degree murder and second degree kidnapping. Before jury selection, the state amended count one of the bill of information to charge aggravated second degree battery, instead of attempted first degree murder. Following trial in July 2003, a jury returned a verdict of guilty as charged on both counts. The defendant filed motions for new trial and for post-verdict judgment of acquittal. The defendant based her motion for new trial on information supplied by an employee of the Thibodaux Regional Medical Center, Sheila Marie Williams, who claimed the victim *468 had informed her that he had suffered a second beating at the Thibodaux City Police Station. The defendant asserted this evidence established that the severe injury suffered by the victim was a result of a police beating and not from her baseball bat. Following a hearing in September 2003 at which Williams testified, the trial court denied both of the defendant's post-trial motions. Subsequently, the trial court sentenced the defendant to concurrent terms of 15 years imprisonment at hard labor, and ordered that the first two years be served without benefit of parole, probation, or suspension of sentence.
On appeal, the defendant raised three assignments of error: insufficient evidence as to the charge of second degree kidnapping, erroneous denial of the motion for new trial, and excessive sentence. Based on the jury's credibility determinations, the appellate court held the evidence was sufficient to convict the defendant as a principal to the second degree kidnapping. A majority of the appellate court panel, however, held that the trial court had erred in denying the motion for new trial. The majority reversed that conviction, along with the aggravated second degree battery conviction, after finding merit in the defendant's claim that the newly discovered evidence allegedly proved that the victim's injuries were possibly caused by a beating inflicted by the Thibodaux police and not at the hands of the defendant, who on the stand denied hitting the victim in the head with her bat. State v. Coleman, 04-0758 (La.App. 1st Cir.3/24/05), 918 So.2d 23. On rehearing granted in part, the appellate court majority again reversed both convictions, reasoning that the new evidence "could perhaps add weight to defendant's credibility as to both charges." State v. Coleman, 04-0758 (La.App. 1st Cir.5/20/05), 918 So.2d 23, 40 (on reh'g).[4]
We granted the state's application to examine the correctness of the appellate court's ruling reversing the convictions and sentences. State v. Coleman, 05-K-1617 (La.1/12/07), 948 So.2d 140.
DISCUSSION
Under La.Code Crim. Proc. art. 851(3), a court "shall grant a new trial whenever . . . [n]ew and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty." State v. Knapper, 555 So.2d 1335, 1339 (La.1990). Thus, a new trial shall be granted based on Article 851(3) when: (1) new evidence was discovered after trial; (2) the new evidence is material; (3) the failure to discover the evidence was not due to a lack of diligence on the part of the defense; and (4) had the evidence been introduced, the verdict or judgment of guilty probably would have been changed. See State v. Cavalier, 96-3052, 97-0103, p. 3 (La.10/31/97), 701 So.2d 949, 951; State v. Hammons, 597 So.2d 990, 994 (La.1992); Knapper, 555 So.2d at 1339.
A ruling on a motion for a new trial rests within the sound discretion of the trial judge. State v. Quimby, 419 So.2d 951, 960 (La.1982). In State v. Talbot, 408 So.2d 861 (La.1980), we explained the trial judge's obligation as follows:
The scope of the trial judge's duty toward the motion for a new trial based upon the new evidence must be kept in mind. It was not for him to determine the guilt of [another alleged suspect] or *469 the innocence of [the defendant]; it was not for him to weigh the new evidence as though he were a jury, determining what is true and what is false. The judge's duty was the very narrow one of ascertaining whether there was new material fit for a new jury's judgment. If so, will honest minds, capable of dealing with evidence, probably reach a different conclusion, because of the new evidence, from that of the first jury? Do the new facts raise debatable issues? Will another jury, conscious of its oath and conscientiously obedient to it, probably reach a verdict contrary to the one that was reached on a record wholly different from the present, in view of evidence recently discovered and not adducible by the defense at the time of the original trial?
Talbot, 408 So.2d at 885.
More recently, in State v. Watts, 00-0602 (La.1/14/03), 835 So.2d 441, we quoted the above passage with approval and added:
The test is objective in that the trial judge does not sit as the ultimate arbiter of the resolution of the case once the new evidence is considered, that is, the trial court does not weigh the evidence. The role of the trial court is to review the evidence constituting the State's case, not to determine the sufficiency of the evidence, but to evaluate the effect of the newly discovered evidence.
Watts, 00-0602, p. 7, 835 So.2d at 447 (footnote omitted) (citing State v. Hammons, 597 So.2d at 998).
The state conceded that Williams's testimony was newly discovered evidence. The trial judge agreed and further noted that the failure to discover hospital employee Williams's connection to the case was not attributable to any lack of diligence on the part of defendant. No party disputes that finding. Accordingly, the issues before this court are whether the newly discovered evidence is fit for the jury's consideration in a new trial, whether the evidence is material, and whether introduction of this evidence at trial would have probably resulted in a different verdict.
The state argues the appellate court erred when it found that the newly discovered evidence had a probability of rendering a different verdict if presented to the jury, as the newly discovered evidence constitutes hearsay; the evidence appears vague, unreliable, and not material; and, even if admissible and material, the evidence would not have changed the outcome of the jury's guilty verdict. Further, the state contends Williams's testimony regarding whether the victim had undergone surgery at the time of her interview and whether he was conscious during her interview was contrary to the testimony of the victim's neurosurgeon, Dr. Donner, who testified that the victim was rushed into surgery very soon after he arrived at the hospital and that the victim was deeply comatose at that time and remained consistently comatose thereafter.
The defendant counters that the new evidence is admissible because it is not hearsay, but is instead part of the "res gestae" of the offense, comparable to the statement the victim made to police when he was found in the parking lot. The defendant also argues that the evidence, if hearsay, is admissible under an exception to the rule barring hearsay evidence, namely, as a statement in contemplation of death, as a present sense impression or excited utterance, as a statement of mind or physical condition, or as a statement for medical treatment. Additionally, the defendant argues that the statement to Williams possessed indicia of reliability, as it was made to a hospital worker, a disinterested third party. The defendant contends the evidence, even if hearsay, justifies *470 a new trial in the interest of justice, because it will allow an investigation to discover non-hearsay, corroborative evidence that would create a reasonable doubt. The defendant lastly points out that the testimony contained non-hearsay evidence in that it consisted of the witness's observations of the defendant's physical condition.
For the reasons set forth below, we find the trial court did not abuse its discretion in denying the motion for new trial. We first turn to the newly discovered evidence in the testimony of Williams.
Williams interviewed the victim in the ICU of Thibodaux Regional Hospital the day after he was admitted for the purpose of obtaining information for Medicaid forms. Specifically, Williams's job was to complete a "Victim of Crime Report" for the hospital and the state. Williams recalled that the victim was in ICU when she conducted the interview, and she described his physical condition as follows:
A: He had a lot of bruises and abrasions. Uh, when I saw him, he hadn't been quite cleaned up yet so there was a lot of blood stains and blood . . . [a]round the head. In his face, around his eyes. No major trauma to the back that I could see. It was in the facial part because it was swelling. He was starting to swell when I met him.
According to Williams, the blood around Bayonne's lips, jaw, neck and facial areas indicated simply that "he hadn't been cleaned," because he "had never undergone surgery to [her] knowledge." During the approximate one to two hours that Williams spent with the victim, she described him as "awake, incoherent, in and ou[t] of consciousness." Williams indicated that she had to lean closer to understand the victim's mumbling. Despite the victim's fading "in and out" of consciousness, Williams was able to ascertain that "he had been beaten twice," relating in the following colloquy:
A: . . . And that time I asked him and he kept saying, `the police, the police, the police.' And I kept saying, `Why are [you] saying that? What happened to you with the police.' * * *
Q: Did he describe the beating from the police?
A: Not in detail. He just kept saying the same thing over and over and over. Just, `The police. The police, the police.[']
Williams conceded that the victim's invocation of the word police was not in response to any particular question she had asked, although she volunteered that she "was trying to find out from him who had beaten him."
In a critical portion of her testimony, heavily emphasized by the appellate court majority in both opinions, Williams recalled that:
A: All he was saying was the police and because he kept saying the same thing over and over then I asked him, `Mr. Baion, were you beaten by the police?' And I asked him did he understand that-I asked if he understood what I was saying blink his eyes or say yes.
Q: And what did he do?
A: He said, `Yes.'
Q: Did he blink his eyes too?
A: He did that too.
On cross-examination, the state exposed the discrepancy with Williams's time line:
Q: If Dr. Donner had testified that Mr. Baion had brain surgery the night he was brought within or a fairly short period of time after he was brought in, would you tend to think that maybe your impression was incorrect? That he had not [had surgery] when you saw him?

*471 A: I wouldn't know ma'am. I read his records. I don't recollect what I read that day.
Q: And my question to you is, if you were advised that Doctor Thomas Donner testified that he was the neurosurgeon who did surgery on Mr. Baion within an hour to two hours after he was brought in to the hospital, would you have any reason to dispute Doctor Donner's testimony?
A: No.
* * *
Q: Let me ask you this, Ms. Williams. If Dr. Donner testified that Mr. Bion's condition was [deteriorating] from the time that he had this head injury, that it was a massive head injury and that his condition was [deteriorating] and he would have died without surgery and his condition never improved and he can't talk, are you just saying Dr. Donner's wrong?
A: No, ma'am. . . . He only talked to me the first time I saw him and that was it. Never again.
Williams assessed the victim's state as "in and out" of consciousness based on her observations that he would "talk and then he would quit talking." She assumed that he was on medication because of "all the machines on him." Williams admitted that the victim was not able to give her much of the information that she sought as to his financial status or answer any of her questions "other than his name" and repeating the word "police."
The victim's mother, Mary Thomas, also testified, and her testimony diverged with Williams's on the issue of whether the victim could speak. Ms. Thomas testified that she went to the hospital on the night following her son's attack, arriving after he had undergone surgery. She stated that she arrived at the hospital at about 7:30 p.m. and that her son was in a deep coma, breathing with the assistance of a machine. According to the victim's mother, her son was unable to speak from the time she first saw him at the hospital to the time he was discharged.
The police video, introduced at trial, shows the victim arriving at the police station and being booked. No sign of injury is apparent, and nowhere on the video is there any evidence whatsoever of the police striking the victim, who in one moment went from standing at the booking desk to putting his head down and then slumping over moaning. The police officers are heard asking, "Frank, Frank, what's the matter. Are you okay. Do you want some water." When no response came from the victim, the police called EMT's. The video shows the paramedics lifting the victim onto the stretcher for transport by ambulance to the hospital. In contrast to Williams's testimony, there are no bloody facial features, bruising or swelling revealed on the victim's face on the tape.
Williams's lay assessment that the victim had not yet undergone surgery when she interviewed him and was coherent at times during that interview does not comport with Dr. Donner's testimony that the victim was rushed into surgery shortly after his arrival at the hospital and remained comatose thereafter. Dr. Donner, whose credibility has not been questioned, testified that "at the time [Bayonne] came to the emergency room I was trying to get him to the operating room so fast I didn't pay a lot of attention to [assessing the number of blows the victim may have incurred to the head]." According to the doctor, "our rationale at that point was just to try to get him into the operating room as fast as we could to try to save his life." Dr. Donner further indicated that by the time he first saw the victim, he was already "deeply comatose." Dr. Donner *472 also testified that he saw the victim after surgery and throughout his hospitalization at Thibodaux Regional Medical Center and assessed him as consistently comatose.
The trial court denied the motion for new trial, evaluating the testimony offered by Williams as follows:
First of all, Ms. Williams testimony is somewhat incredible here today. Obviously from the medical evidence, if the records and Dr. Donner's testimony is to be believed, Ms. Williams saw Mr. Baion before he had surgery or she saw Mr. Baion after he had surgery and doesn't really recall what she saw that his physical appearance was post surgical. Either one of those two scenarios, her testimony is somewhat incredible.
* * *
I think her testimony is also confusing, in the sense that, she said he was in and out. That he was incoherent but that he was in and out. Now I don't know what that means, if she slips in to ask him a question when he's apparently in, how does she know when he goes out. I don't know.
* * *
If she testified-if this witness said in front of the jury everything that she said here in this courtroom today and the other witnesses gave the same testimony, I would have to conclude that a reasonable fact finder would have to exclude her testimony as being so far outweighed by the other evidence that it would be incredible for me to say here today that it would likely produce a different verdict.
Finally, the judge opined that even if he were to grant the motion for new trial, he could not imagine Williams's testimony in which she recalled the victim's statements to her would ever overcome a hearsay objection.[5]
The admissibility at a new trial of the newly discovered evidence is a factor in determining its "fitness" for consideration by a jury at a second trial, and it should be addressed before a conviction is reversed and a new trial ordered. See State v. Watts, 00-0602 at 12-13, 835 So.2d at 452. While the trial court did not make a specific finding as to the hearsay nature of Williams's testimony at the conclusion of the hearing, its remarks clearly suggested that admissibility would likely be an insurmountable obstacle had the evidence been offered for trial. Yet, because the trial court found the evidence would not result in a different verdict if presented to another jury, it was not required to decide the admissibility of that evidence at a subsequent trial. Cf. State v. Watts, 00-0602 at 12-13, 835 So.2d at 452.
At any rate, the defense contends the victim's statements to Williams do not constitute hearsay, or should be admissible under various exceptions to the hearsay rule. Hearsay is defined by La.Code Evid. art. 801(C) as a "statement, other than the one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted" and is inadmissible *473 except as provided by law. La.Code Evid. art. 802. Because the defendant seeks to introduce the out-of-court statements to prove that the police rather than the defendant possibly caused the victim's injury, Williams's testimony as to what the victim had allegedly communicated to her, either verbally or non-verbally, about the police beating him certainly constitutes hearsay evidence.
Furthermore, although the defendant asserts that a variety of hearsay exceptions would permit introduction of Williams's testimony to a jury, that argument falters at the first hurdle. Williams freely conceded that the victim never stated directly that the police beat him. Although a statement for purposes of La. Code Evid. art. 801(A)(1) and (2) may include nonverbal conduct "intended . . . as an assertion," Williams's testimony left insolvably ambiguous, apart from her own opinion of what the victim may have meant, whether the victim's statement, "Yes," and the blinking of his eyes meant, "Yes, the police beat me," or "Yes, I understand what you are saying." Accordingly, even assuming that the victim repeatedly uttered "the police" in Williams's presence, her opinion as to what he meant in response to her questions would not be admissible under any exception to the hearsay rule. Therefore, the trial court was correct in ruling that the evidence was not fit to be considered by a second jury.
At any rate, even if the testimony could have been admitted over the state's inevitable hearsay objection, we find the trial court clearly did not abuse its broad discretion in denying the motion for new trial on the basis that, ultimately, Williams's testimony would probably not change the result at a second trial. In finding otherwise, the appellate court majority took a skewed view of Dr. Donner's testimony. While stating that ordinarily a person with the kind of severe head injury experienced by the victim would quickly manifest symptoms of an impending neurological crisis, Dr. Donner also testified that it is "actually not surprising when people show up with sizable subdural hematomas in the emergency room and little in the way of acute complaints before they appear." Given the size of the hematoma that formed on the victim's brain, Dr. Donner would not give "it more than an hour or two before, you know, he became symptomatic." In the interim, the victim would have experienced "an evolution of this venous bleeding which . . . can occur . . . sort of at a slow to deliberate rate until people start to become symptomatic." Thus, the time line offered by the state of the incident from its inception in the store parking lot to the victim's collapse at the station house, or just about an hour and a quarter, falls within the "hour or two" period of time Dr. Donner gave for the "unusual" but not rare case in which evolutionary bleeding within the brain manifests in the onset of symptoms leading to a deep coma after the initial injury and tearing of a blood vessel.
Thus, contrary to the appellate court majority's reasoning, in light of the entirety of Dr. Donner's testimony, the trial court had a reasonable basis for concluding that Williams's account of the alleged statements, verbal or non-verbal, of a fitfully conscious victim sometime after the emergency room admitted him in a "deeply comatose" state, did not constitute material evidence that would have resulted in a different verdict had it been presented to the jury. The state's theory of the case was that the defendant took the law into her own hands rather than wait for police, struck the victim with her bat, chased him to the convenience store, had him forcibly removed from the store, and, along with an angry mob incited by the defendant, began *474 to beat the victim, striking him in the head with her bat, thereby causing a severe injury to his brain. The trial court's conclusion that the verdicts of guilt on both counts would not have changed on the basis of Williams's testimony was reasonable. At a subsequent trial, jurors could do no more than speculate that the victim tried to tell Williams that the police had beaten him in addition to the beating he received at the hands of the defendant. The evidence introduced by the state, including the videotape of the booking which showed the victim's actual collapse, was entirely consistent with the state's theory of the case, as jurors necessarily found when they returned the verdicts of guilty on both counts. The defendant denied striking the victim in the head with her bat in the parking lot of the store, though witnesses testified otherwise. The case, as the appellate court noted, turned on the credibility of the defendant and the state's witnesses. Williams's testimony, when presented to "honest minds capable of dealing with evidence," would not have reasonably tipped that credibility decision in favor of the defendant. The record thus establishes the trial court properly evaluated the effect of the newly discovered evidence on the record evidence constituting the state's case and reasonably concluded that the outcome of a guilty verdict would not have been different.
For these reasons, we conclude the appellate court majority erred in finding the trial court abused its discretion in denying the defendant's motion for a new trial based on newly discovered evidence. Accordingly, we vacate the appellate court's decision, which reversed the defendant's convictions for aggravated second degree battery and second degree kidnapping, and we remand the case to the court of appeal for consideration of the defendant's remaining assignment of error.

DECREE
DECISION VACATED AND CASE REMANDED TO THE COURT OF APPEAL.
JOHNSON, J., concurs.
NOTES
[*] Retired Judge Fred C. Sexton sitting ad hoc for Associate Justice John L. Weimer, recused.
[1] The victim's surname is spelled variously in the record as "Baion," "Bion," and "Bayonne." This opinion adopts the spelling also adopted by the appellate court opinion, "Bayonne."
[2] Ayrow and Adams pleaded guilty to simple kidnapping and were sentenced, respectively, to four and three years imprisonment at hard labor.
[3] Latasha Green pleaded guilty to simple battery.
[4] The appellate court pretermitted its review of the defendant's third assignment of error in which she claimed the court imposed an excessive sentence. Coleman, 04-0758 at 16, 918 So.2d at 32.
[5] At the outset of the hearing on the motion for new trial, the state objected to the hearsay nature of the testimony that the defense was anticipating presenting through its newly-discovered witness, Williams, the gist of which would be to repeat what the victim stated to Williams, namely that he was beaten by Thibodaux police officers. The state further objected that no exception under La.Code Evid. arts. 803 and 804 applied. To avoid unnecessary delay, the judge permitted the hearing to go forward and indicated that he would address the evidentiary (hearsay) issue at the time he ruled on the motion for new trial.