918 So.2d 23 (2005)
STATE of Louisiana
v.
Jennifer COLEMAN.
No. 2004 KA 0758.
Court of Appeal of Louisiana, First Circuit.
March 24, 2005.
Opinion Granting Rehearing and Clarification in Part May 20, 2005.
*25 Julie E. Cullen, Assistant Attorney General, Baton Rouge, Counsel for Plaintiff/Appellee State of Louisiana.
Pamela S. Moran, New Orleans, Counsel for Defendant/Appellant Jennifer Coleman.
Before: WHIPPLE, DOWNING, and HUGHES, JJ.
DOWNING, J.
The defendant, Jennifer Coleman, was charged by bill of information with aggravated second degree battery (count one) and second degree kidnapping (count two), violations of La. R.S. 14:34.7 and La. R.S. 14:44.1, respectively. She entered a plea of not guilty as to both charges. The trial court denied the defendant's oral motion to suppress statements.[1] Upon completion of a trial by jury, the defendant was found guilty as charged on both counts. The trial court denied the defendant's motion for post verdict judgment of acquittal and motion for a new trial. On count one, the defendant was sentenced to fifteen (15) years imprisonment at hard labor and to pay a fine of five thousand dollars ($5,000.00) plus court costs. Upon the failure to pay the fine and costs, the trial court ordered the defendant to serve an additional six (6) months in the parish detention center. On count two, the defendant was sentenced to fifteen (15) years imprisonment at hard labor, without the benefit of probation, parole, or suspension of sentence for the first two years. The sentences are to run concurrent with each *26 other. The defendant now appeals, arguing that the trial court erred in denying her motion for a new trial and motion for post verdict judgment of acquittal, and that the sentence imposed on count one is illegal and unconstitutionally excessive. For the following reasons, we reverse both convictions, vacate the sentences imposed, and remand for a new trial.

STATEMENT OF FACTS
On May 25, 2001, at approximately 8:16 p.m., the defendant contacted the Thibodaux City Police Department to report the burglary of her apartment located at 1206 Plantation Road in Thibodaux, Louisiana. The defendant had begun moving out of this apartment approximately one week prior to this incident. Although the defendant was no longer sleeping in the apartment at the time, some of her belongings remained in the apartment. The defendant's new apartment was located in "the backyard" of her old apartment. According to the defendant, upon entering her old apartment, she noticed that some of her belongings were either out of place or missing. Officer Albert King of the Thibodaux City Police Department responded to the defendant's complaint. Officer King noted that it appeared the screen door of the apartment had been pried open. The officer made a list of the items that the defendant indicated were missing from the apartment. After meeting with Officer King, the defendant took some of her belongings (including a bat) out of the old apartment and went back to her new apartment.
Shortly after arriving at her new apartment, Latasha Green, the defendant's neighbor, told the defendant that she observed a male, later identified as Frank Bayonne (the victim), exiting the defendant's old apartment.[2] The defendant grabbed her bat and went to the old apartment to look for the victim. As the defendant approached the apartment, the victim was walking out of the back door and around the side of the apartment. The defendant confronted the victim regarding the whereabouts of her belongings. According to witnesses, the defendant struck the victim on the leg with the bat. The victim ultimately stated that he would return the defendant's belongings. The defendant swung the bat at the victim and he fled to a nearby convenience store.
The defendant, Green, and others (including Renatta Robinson) followed the victim to the store. A crowd, consisting of approximately twenty people, developed. The victim entered the store. At the defendant's request, two males, Derrick Adams and Anthony Ayrow, forcefully removed the victim from the store. Once the victim was forced outside of the store, several individuals began to physically attack him. The defendant struck the victim when he was on the ground with the baseball bat.
At approximately 8:41 p.m., the Thibodaux City Police Department was contacted regarding the fight in progress. Lieutenant Sherman Berry of the Thibodaux City Police Department was in the area and arrived at the scene promptly. Officer King and Officer Anthony Carona (also of the Thibodaux City Police Department) arrived moments later. When the officers arrived at the scene, the brawl was over and the crowd had dispersed. The victim was standing in the parking lot with no visible injuries. The defendant informed the officers that the victim was the individual who burglarized her apartment. The victim was placed under arrest and transported to the police station by Officer Carona.
*27 Officer Carona arrived at the police station at approximately 8:52 p.m. and placed the victim in a holding cell. The victim did not complain of any discomfort or pain and only stated that he was thirsty. Officer Carona gave the victim some water and then left to resume street patrol duty. A request for an ambulance was made at approximately 9:10 p.m., after the victim lost consciousness. The victim was transported to the emergency room at Thibodaux Regional Medical Center and underwent an immediate CAT scan of the brain and surgery. The CAT scan demonstrated that the victim had suffered a large acute subdural hematoma, which in layman's terms is a large blood clot on the surface of the brain between the brain and the inside of the skull. The victim was treated by Dr. Thomas Donner, a neurosurgeon. After surgery, the victim remained in a comatose state and was ultimately transferred to a nursing home. At the time of the trial, the victim was a resident of a nursing home in Natchitoches, Louisiana and reported as being unable to walk, talk, or feed himself. His condition is permanent.

ASSIGNMENT OF ERROR NUMBER TWO
In the second assignment of error, the defendant avers that the trial court erred in denying her motion for post verdict judgment of acquittal. The defendant specifically avers that the evidence presented at the trial was insufficient to support the second degree kidnapping conviction. The defendant contends that while she may have injured the victim, the State failed to show that she forcibly seized the victim from one location and transported him to another.
When issues are raised on appeal, both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. When the entirety of the evidence, including inadmissible evidence which was erroneously admitted, is insufficient to support the conviction, the accused must be discharged as to that crime, and any discussion by the court of the trial error issues as to that crime would be pure dicta since those issues are moot. State v. George, 95-0110, p. 6 (La.10/16/95), 661 So.2d 975, 978.
The Jackson v. Virginia standard, now legislatively embodied within La.Code Crim. P. art. 821, is applicable in cases involving both direct and circumstantial evidence. State v. Smith, 441 So.2d 739, 741 (La.1983). When analyzing circumstantial evidence, La. R.S. 15:438 provides that the fact finder must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. State v. McLean, 525 So.2d 1251, 1255 (La.App. 1st Cir.), writ denied, 532 So.2d 130 (La.1988). When a case involves circumstantial evidence, however, and the trier of fact reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. State v. Captville, 448 So.2d 676, 680 (La.1984).
Second degree kidnapping is defined, in pertinent part, as the forcible seizing and carrying of any person from one place to *28 another, wherein the victim is physically injured. La. R.S. 14:44.1 A(3) & B(1). La. R.S. 14:24 defines "principals" as "[a]ll persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime[.]"
According to the testimony of State witness Latasha Green, the defendant informed Derrick Adams and Anthony Ayrow that the victim had broken into her apartment and told the two males to "go get him." Adams's testimony indicated that he has known the defendant "all my life." He stated that he observed the defendant and others as they followed the victim before he entered the store. Adams further stated that the defendant wanted the victim "outside of the store he was in." Adams admitted that he physically forced the victim out of the store against his will. The following colloquy took place:
Q. Okay. What did you see Anthony Ayrow do in the store when you went in there to talk to Frank Bayonne?
A. Grabbed the man by the arm and pulled him out.
Q. Did the man want to go out?
A. No.
Q. How did he get out of the store?
A. Illegal force.
Q. Excuse me?
A. Force.
Q. And who forced him out of the store?
A. Me and Anthony Ayrow.
Q. And why did y'all force him out of the store?
A. For them, for the girls.
Q. All right. Now, what happened once Mr. Bayonne got out of the store, was forced out of the store?
A. They just jumped on him.
Anthony Ayrow (also known as Jennerette) knew the defendant for several years and stated that they were friends at the time of the instant offenses. During his trial testimony, Ayrow admitted to taking the victim out of the store by the arm, but stated that he "escorted" the victim out of the store and that the victim seemed willing. Ayrow further contended that he did not hear the defendant make any statements prior to his entering the store to get the victim. He indicated that he wanted the victim to exit the store because he was "[t]rying to be a peacemaker." He did, however, confirm that he knew that he was aware the victim "had stolen some goods out of Jennifer Coleman's house" because "[t]hat's what the talk was about."
State witness Calvin Brooks IV, the defendant's cousin, was also present at the scene. Although Brooks initially stated that the defendant arrived at the store after others began to physically attack the victim, he stated that he heard the defendant say "bring him out the store." He stated that he guessed the defendant was talking to "Derrick and Jennerette."
Renatta Robinson was an associate of the defendant and had known her for a "couple of years" at the time of the instant offenses. Robinson was present at the scene. Robinson indicated that Adams asked the defendant if she wanted him to "catch" the victim, and the defendant responded positively. She later, during her testimony, stated that the defendant "told one of them, I don't remember which one, she told him to get him for her or whatever" and that "they grabbed him and pulled him out."
During her trial testimony, the defendant stated that she did not tell anyone to go into the store and get the victim. She stated that she did not talk to Adams when *29 she approached the store, but that she only opened the door of the store and yelled at the victim. She further stated that she was angry and that she told the victim the police were on their way. She also questioned the victim regarding her belongings. She stated that she briefly turned her back and when she turned back around, the victim was out of the store and "everybody was just crowded on him." According to the defendant, others began to kick and stomp the victim. She further indicated that, although she still had the bat in her hand, she did not strike the victim at that time. The defendant stated that witnesses providing testimony in conflict with the testimony provided by the defendant were "lying."
In addition to the testimony presented at trial, the State presented the videotape of the surveillance in the store on the night in question. The images on the tape were unclear and only the inside of the store could be viewed. However, the tape revealed the voice of someone outside of the store yelling "take him out the store" just prior to someone being forcibly removed from the store.
As the trier of fact, the jury is free to accept or reject, in whole or in part, the testimony of any witness. State v. Johnson, 98-1407, p. 6 (La.App. 1st Cir.4/1/99), 734 So.2d 800, 805, writ denied, 99-1386 (La.10/1/99), 748 So.2d 439. Furthermore, where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Mullins, 464 So.2d 459, 463 (La.App. 1st Cir.1985). On appeal, this Court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. State v. Creel, 540 So.2d 511, 514 (La.App. 1st Cir.), writ denied, 546 So.2d 169 (La.1989).
After viewing the totality of the evidence presented in a light most favorable to the prosecution, a rational trier of fact could have concluded beyond a reasonable doubt that the evidence presented by the State was sufficient to find the defendant guilty as a principal to the second degree kidnapping of the victim. The defendant's arguments to the contrary are without merit.

ASSIGNMENT OF ERROR NUMBER ONE
In the first assignment of error, the defendant avers that the trial court erred in denying her motion for new trial. The defendant's motion for new trial was based on the discovery of new and material evidence that would have changed the outcome of the trial. The motion states that the victim informed an employee of the Thibodaux Regional Medical Center that he suffered a second beating at the Thibodaux City Police Station. The defendant specifically argues that evidence revealed at the hearing on the motion for new trial would have raised a reasonable doubt as to who was responsible for the injuries suffered by the victim if the evidence had been presented at the trial. The defendant contends that the evidence was not discovered prior to the trial, despite the exercise of diligence.
Under Louisiana jurisprudence, in order to obtain a new trial based on newly discovered evidence, the defendant has the burden of showing: (1) the new evidence was discovered after trial; (2) the failure to discover the evidence at the time of trial was not caused by lack of diligence; (3) the evidence is material to the issues at trial; and (4) the evidence is of such a nature that it would probably have produced a different verdict. State v. Smith, 96-0961, p. 7 (La.App. 1st Cir.6/20/97), 697 *30 So.2d 39, 43; see also La.Code Crim. P. art. 851(3). In evaluating whether the newly discovered evidence warrants a new trial, the test to be employed is not simply whether another trier of fact might render a different verdict, but whether the new evidence is so material that it ought to produce a verdict different from that rendered at trial. The trial court's denial of a motion for new trial will not be disturbed absent a clear abuse of discretion. State v. Henderson, 99-1945, pp. 15-16 (La.App. 1st Cir.6/23/00), 762 So.2d 747, 758, writ denied, 2000-2223 (La.6/15/01), 793 So.2d 1235.
In denying the motion for new trial, the trial court, in part, concluded that the admission of the presented testimony would not have produced a different verdict. The trial court specifically stated that the testimony was "so far outweighed by the other evidence that it would be incredible for me to say here today that it would likely produce a different verdict." After a careful review of the record, we conclude that the newly discovered evidence probably would have changed the verdict and that defendant is entitled to a new trial on the basis of the newly discovered evidence.
The testimony presented at the trial indicated that the victim was placed in a holding cell upon his arrest and abruptly lost consciousness. Dr. Donner, an expert in neurosurgery, testified that there was no reliable way to determine the number of blows to the head inflicted upon the victim. Dr. Donner also stated that he could not provide any information as to which blow caused the subdural hematoma. Dr. Donner indicated that a person who received the type of injury sustained by the victim herein (a two centimeter midline shift) would lose consciousness in less than one hour after the injury was inflicted. Dr. Donner stated, "a patient just simply isn't going to walk around with a two centimeter midline shift for very long before they lose consciousness." The following colloquy took place during the State's direct examination of Dr. Donner:
Q. How much  Would a patient become lethargic or drowsy or tired and, I mean, would they appear to be drowsy or tired after sustaining an injury like this?
A. Yes, but that may not be related to the subdural hematoma. That could just be due to the concussive force of the head injury. You know, I guess the best analogy is a boxer that gets knocked out. They may not have a subdural hematoma but they've taken a blow to the head and they'll briefly lose consciousness. So, I don't know that you could immediately attribute that to a subdural hematoma.
During cross-examination, Dr. Donner further indicated that it was uncommon for a patient to be asymptomatic after sustaining the type of injury suffered by the victim. On re-direct examination, Dr. Donner testified that some people will have a "lucid interval" in which the person will be fairly asymptomatic for a short period of time before undergoing a fairly dramatic neurologic decline. Dr. Donner offered a period of two (2) hours as a generous estimation of how long this lucid interval could possibly last. However, Dr. Donner's testimony clearly indicated that generally, signs and/or symptoms of injury, including complaints of pain, nausea, and/or the inability to walk, are instant.
During the trial, Officer Carona testified that he did not abuse the victim or observe anyone injure or abuse the victim after his arrest. However, after transporting the victim, Officer Carona resumed street patrol and had no further contact with the victim. Thus, Officer Carona was not present when the victim lost consciousness or during the moments before. Lieutenant *31 Blanchard, the officer present when the victim lost consciousness, did not testify at the trial. Moreover, the testimony of the officers present at the scene indicated that the victim had no apparent signs of injury or symptoms at the time of the arrest. When Lieutenant Berry arrived at the scene, the victim was standing in the parking lot. Lieutenant Berry did not question the defendant in reference to a fight that may have taken place, only in reference to the alleged burglary of defendant's residence. After speaking with the defendant, Lieutenant Berry advised Officer Carona to place the victim under arrest. During his testimony Lieutenant Berry stated, "[a]t the time when I advised him he was being placed under arrest, he told me that he didn't do anything and I didn't see any injuries or anything all (sic), no markings whatsoever." The following colloquy took place during the direct examination of Officer King's testimony by the defense,
Q. Did you see the alleged victim of the fight at the Mini Mart?
A. Yes, I did. He was standing in the parking lot and when we arrived there he was just standing in the parking lot by hisself (sic), so we give a call to headquarters saying everything was, you know, like, normal. And when we approached him, he was just standing there, you know, he was conscious and everything, he wasn't bleeding, didn't have no knots or anything like that.
Q. Did you speak with him?
A. Yes, I did. And he was fully conscious and everything.
Q. Did he volunteer anything about what had happened?
A. No, because I asked him, I said  I told Sgt. Berry, for a lot of guys supposed to have jumped on him, he ain't got no, like I say, no knots, he wasn't bleeding from anywhere or anything like that and he was fully conscious.
Q. And did you speak with him?
A. Yes, I did.
Q. Was he coherent?
* * *
Q. Did you ask Mr. Bayonne what had happened?
A. Yes, we did.
Q. What did you ask him?
A. I asked him whether he was involved in a fight. He told me no.
Officer Carona transported the victim to the police department. The victim did not complain of any discomfort and only requested something to drink.
At the hearing on the motion for new trial, the defendant presented the testimony of Sheila Williams. Williams, as an employee of Thibodaux Regional Medical Center, interviewed the victim for a Victim of Crime Report for the hospital and the State of Louisiana. The victim was in ICU at the time of the interview. When questioned as to whether or not the contact took place before or after the victim's surgery, Williams indicated that the victim had not, to her knowledge, undergone surgery. She stated that the victim had "a lot of bruises and abrasions" and "blood stains" "[a]round the head," "his face, around his eyes." She further stated that she observed a lot of trauma to the victim's face. Williams stated that the victim was awake, but in and out of consciousness. Her testimony unequivocally indicates that the victim had periods of consciousness and coherence during her interview of him. According to Williams's testimony, the victim indicated that he had been beaten twice and repeatedly said, "the police, the police, the police." She indicated that the victim did not independently state that he was beaten at the police station, but when she asked whether the police beat him he *32 answered positively. During cross-examination, the following colloquy took place:
A. All he was saying was the police and because he kept saying the same thing over and over then I asked him, "Mr. Baion, were you beaten by the police?" And I asked him did he understand that  I asked if he understood what I was saying blink his eyes or say yes.
Q. And what did he do?
A. He said, "Yes".
Q. Did he blink his eyes too?
A. He did that too.
Williams confirmed that she did not present this information to the defense until after the trial. It was stipulated that Mrs. Williams's name was not in pre-trial discovery or records that were provided to the defense attorney.
Upon motion for a new trial, the trial judge's duty is not to weigh the new evidence as though he were a jury determining guilt or innocence, rather his duty is the narrow one of ascertaining whether there is new material fit for a new jury's judgment. State v. Hammons, 536 So.2d 598, 600 (La.App. 1st Cir.1988). Herein, the testimony presented at trial indicated that victims of the type of injury suffered by the victim normally have immediate symptoms and/or signs of injury. The officers present at the scene indicated that the victim had no symptoms or visible signs of injury prior to his arrest. The officers who testified at the trial were not present at the police station when the victim lost consciousness. According to Williams's testimony presented at the hearing on the motion for new trial, the victim indicated that he had been beaten on two separate occasions and repeatedly stated, "the police." The victim said "yes" when asked whether the police beat him. We find Williams's testimony sufficient to raise a reasonable doubt as to whether or not the defendant actually inflicted the serious bodily injury suffered by the victim herein. Taking all of the above into consideration, the newly-discovered evidence is of such a nature that the outcome of the trial would most likely have been different had it been presented at trial.
Thus, the defendant met the requisite burden by showing that (1) the new evidence was discovered after trial, (2) the failure to discover the evidence at the time of trial was not caused by lack of diligence, (3) the evidence is material to the issues at trial, and (4) the evidence is of such a nature that it would probably have produced a different verdict. We find that the trial court abused its discretion in denying the motion for new trial. This assignment of error has merit. Due to the foregoing finding, we pretermit discussion of the sentencing issues raised in assignment of error number three.

DECREE
For the foregoing reasons, we reverse the convictions on counts one and two. We vacate the sentences and remand for a new trial.
CONVICTIONS REVERSED ON COUNTS ONE AND TWO; SENTENCES VACATED; REMANDED FOR A NEW TRIAL
WHIPPLE, J., dissents and would affirm, finding no error.
DOWNING, J., on rehearing.
We grant the State's "Application for Rehearing and Clarification," in part, to clarify our prior opinion herein. The defendant, Jennifer Coleman, was charged by bill of information with aggravated second degree battery (count one) and second degree kidnapping (count two), violations of La. R.S. 14:34.7 and La. R.S. 14:44.1, respectively. She entered a plea of not *33 guilty as to both charges. The trial court denied the defendant's oral motion to suppress statements.[1] Upon completion of a trial by jury, the defendant was found guilty as charged on both counts. The trial court denied the defendant's motion for post verdict judgment of acquittal and motion for a new trial. On count one, the defendant was sentenced to fifteen (15) years imprisonment at hard labor and to pay a fine of five thousand dollars ($5,000.00) plus court costs. Upon the failure to pay the fine and costs, the trial court ordered the defendant to serve an additional six (6) months in the parish detention center. On count two, the defendant was sentenced to fifteen (15) years imprisonment at hard labor, without the benefit of probation, parole, or suspension of sentence for the first two years. The sentences are to run concurrent with each other. The defendant appealed, arguing that the trial court erred in denying her motion for a new trial and motion for post verdict judgment of acquittal, and that the sentence imposed on count one is illegal and unconstitutionally excessive. Upon rehearing, we clarify that for the following reasons, we reverse both convictions. vacate the sentences imposed, and remand for a new trial of both counts.

STATEMENT OF FACTS
On May 25, 2001, at approximately 8:16 p.m., the defendant contacted the Thibodaux City Police Department to report the burglary of her apartment located at 1206 Plantation Road in Thibodaux, Louisiana. The defendant had begun moving out of this apartment approximately one week prior to this incident. Although the defendant was no longer sleeping in the apartment at the time, some of her belongings remained in the apartment. The defendant's new apartment was located in "the backyard" of her old apartment. According to the defendant, upon entering her old apartment, she noticed that some of her belongings were either out of place or missing. Officer Albert King of the Thibodaux City Police Department responded to the defendant's complaint. Officer King noted that it appeared the screen door of the apartment had been pried open. The officer made a list of the items that the defendant indicated were missing from the apartment. After meeting with Officer King, the defendant took some of her belongings (including a bat) out of the old apartment and went back to her new apartment.
Shortly after arriving at her new apartment, Latasha Green, the defendant's neighbor, told the defendant that she observed a male, later identified as Frank Bayonne (the victim), exiting the defendant's old apartment.[2] The defendant grabbed her bat and went to the old apartment to look for the victim. As the defendant approached the apartment, the victim was walking out of the back door and around the side of the apartment. The defendant confronted the victim regarding the whereabouts of her belongings. According to witnesses, the defendant struck the victim on the leg with the bat. The victim ultimately stated that he would return the defendant's belongings. The defendant swung the bat at the victim and he fled to a nearby convenience store, located at the corner of Plantation Road and Tiger Drive.
The defendant, Green, and others (including Renatta Robinson) followed the victim to the store. A crowd, consisting of approximately twenty people, developed. The victim entered the store. At the defendant's *34 request, two males, Derrick Adams and Anthony Ayrow, forcefully removed the victim from the store. Once the victim was forced outside of the store, several individuals began to physically attack him. The defendant struck the victim when he was on the ground with the baseball bat. At approximately 8:41 p.m., the Thibodaux City Police Department was contacted regarding the fight in progress. Lieutenant Sherman Berry of the Thibodaux City Police Department was in the area and arrived at the scene promptly. Officer King and Officer Anthony Carona (also of the Thibodaux City Police Department) arrived moments later. When the officers arrived at the scene, the brawl was over and the crowd had dispersed. The victim was standing in the parking lot with no visible injuries. The defendant informed the officers that the victim was the individual who burglarized her apartment. The victim was placed under arrest and transported to the police station by Officer Carona.
Officer Carona arrived at the police station at approximately 8:52 p.m. and placed the victim in a holding cell. The victim did not complain of any discomfort or pain and only stated that he was thirsty. Officer Carona gave the victim some water and then left to resume street patrol duty. A request for an ambulance was made at approximately 9:10 p.m., after the victim lost consciousness. The victim was transported to the emergency room at Thibodaux Regional Medical Center and underwent an immediate CAT scan of the brain and surgery. The CAT scan demonstrated that the victim had suffered a large acute subdural hematoma, which in layman's terms is a large blood clot on the surface of the brain between the brain and the inside of the skull. The victim was treated by Dr. Thomas Donner, a neurosurgeon. After surgery, the victim remained in a comatose state and was ultimately transferred to a nursing home. At the time of the trial, the victim was a resident of a nursing home in Natchitoches, Louisiana and reported as being unable to walk, talk, or feed himself. His condition is permanent.

ASSIGNMENT OF ERROR NUMBER TWO
In the second assignment of error, the defendant avers that the trial court erred in denying her motion for post verdict judgment of acquittal. The defendant specifically avers that the evidence presented at the trial was insufficient to support the second degree kidnapping conviction. The defendant contends that while she may have injured the victim, the State failed to show that she forcibly seized the victim from one location and transported him to another.
When issues are raised on appeal, both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. When the entirety of the evidence, including inadmissible evidence which was erroneously admitted, is insufficient to support the conviction, the accused must be discharged as to that crime, and any discussion by the court of the trial error issues as to that crime would be pure dicta since those issues are moot. State v. George, *35 95-0110, P. 6 (La.10/16/95), 661 So.2d 975, 978.
The Jackson v. Virginia standard, now legislatively embodied within La.Code Crim. P. art. 821, is applicable in cases involving both direct and circumstantial evidence. State v. Smith, 441 So.2d 739, 741 (La.1983). When analyzing circumstantial evidence, La. R.S. 15:438 provides that the fact finder must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. State v. McLean, 525 So.2d 1251, 1255 (La.App. 1st Cir.), writ denied, 532 So.2d 130 (La.1988). When a case involves circumstantial evidence, however, and the trier of fact reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. State v. Captville, 448 So.2d 676, 680 (La.1984).
Second degree kidnapping is defined, in pertinent part, as the forcible seizing and carrying of any person from one place to another, wherein the victim is physically injured. La. R.S. 14:44.1 A(3) & B(1). La. R.S. 14:24 defines "principals" as "[a]ll persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime[.]"
According to the testimony of State witness Latasha Green, the defendant informed Derrick Adams and Anthony Ayrow that the victim had broken into her apartment and told the two males to "go get him." Adams's testimony indicated that he has known the defendant "all my life." He stated that he observed the defendant and others as they followed the victim before he entered the store. Adams further stated that the defendant wanted the victim "outside of the store he was in." Adams admitted that he physically forced the victim out of the store against his will. The following colloquy took place:
Q. Okay. What did you see Anthony Ayrow do in the store when you went in there to talk to Frank Bayonne?
A. Grabbed the man by the arm and pulled him out.
Q. Did the man want to go out?
A. No.
Q. How did he get out of the store?
A. Illegal force.
Q. Excuse me?
A. Force.
Q. And who forced him out of the store?
A. Me and Anthony Ayrow.
Q. And why did y'all force him out of the store?
A. For them, for the girls.
Q. All right. Now, what happened once Mr. Bayonne got out of the store, was forced out of the store?
A. They just jumped on him.
Anthony Ayrow (also known as Jennerette) knew the defendant for several years and stated that they were friends at the time of the instant offenses. During his trial testimony, Ayrow admitted to taking the victim out of the store by the arm, but stated that he "escorted" the victim out of the store and that the victim seemed willing. Ayrow further contended that he did not hear the defendant make any statements prior to his entering the store to get the victim. He indicated that he wanted the victim to exit the store because he was "[t]rying to be a peacemaker." He did, however, confirm that he knew that he was aware the victim "had stolen some goods out of Jennifer Coleman's house" because "[t]hat's what the talk was about."
*36 State witness Calvin Brooks IV, the defendant's cousin, was also present at the scene. Although Brooks initially stated that the defendant arrived at the store after others began to physically attack the victim, he stated that he heard the defendant say "bring him out the store." He stated that he guessed the defendant was talking to "Derrick and Jennerette."
Renatta Robinson was an associate of the defendant and had known her for a "couple of years" at the time of the instant offenses. Robinson was present at the scene. Robinson indicated that Adams asked the defendant if she wanted him to "catch" the victim, and the defendant responded positively. She later, during her testimony, stated that the defendant "told one of them, I don't remember which one, she told him to get him for her or whatever" and that "they grabbed him and pulled him out."
During her trial testimony, the defendant stated that she did not tell anyone to go into the store and get the victim. She stated that she did not talk to Adams when she approached the store, but that she only opened the door of the store and yelled at the victim. She further stated that she was angry and that she told the victim the police were on their way. She also questioned the victim regarding her belongings. She stated that she briefly turned her back and when she turned back around, the victim was out of the store and "everybody was just crowded on him." According to the defendant, others began to kick and stomp the victim. She further indicated that, although she still had the bat in her hand, she did not strike the victim at that time. The defendant stated that witnesses providing testimony in conflict with the testimony provided by the defendant were "lying." In addition to the testimony presented at trial, the State presented the videotape of the surveillance in the store on the night in question. The images on the tape were unclear and only the inside of the store could be viewed. However, the tape revealed the voice of someone outside of the store yelling "take him out the store" just prior to someone being forcibly removed from the store.
As the trier of fact, the jury is free to accept or reject, in whole or in part, the testimony of any witness. State v. Johnson, 98-1407, p. 6 (La.App. 1st Cir.4/1/99), 734 So.2d 800, 805, writ denied, 99-1386 (La.10/1/99), 748 So.2d 439. Furthermore, where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Mullins, 464 So.2d 459, 463 (La.App. 1st Cir.1985). On appeal, this Court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. State v. Creel, 540 So.2d 511, 514 (La.App. 1st Cir.), writ denied, 546 So.2d 169 (La. 1989).
After viewing the totality of the evidence presented in a light most favorable to the prosecution, a rational trier of fact could have concluded beyond a reasonable doubt that the evidence presented by the State was sufficient to find the defendant guilty as a principal to the second degree kidnapping of the victim. The defendant's arguments to the contrary are without merit. Nonetheless, for the following reasons, we conclude that the defendant's convictions and sentences must be reversed and vacated, and the matter remanded for a new trial of both counts.

ASSIGNMENT OF ERROR NUMBER ONE
In the first assignment of error, the defendant avers that the trial court erred in denying her motion for new trial. *37 The defendant's motion for new trial was based on the discovery of new and material evidence that would have changed the outcome of the trial. The motion states that the victim informed an employee of the Thibodaux Regional Medical Center that he suffered a second beating at the Thibodaux City Police Station. The defendant specifically argues that evidence revealed at the hearing on the motion for new trial would have raised a reasonable doubt as to who was responsible for the injuries suffered by the victim if the evidence had been presented at the trial. The defendant contends that the evidence was not discovered prior to the trial, despite the exercise of diligence.
Under Louisiana jurisprudence, in order to obtain a new trial based on newly discovered evidence, the defendant has the burden of showing: (1) the new evidence was discovered after trial; (2) the failure to discover the evidence at the time of trial was not caused by lack of diligence; (3) the evidence is material to the issues at trial; and (4) the evidence is of such a nature that it would probably have produced a different verdict. State v. Smith, 96-0961, p. 7 (La.App. 1st Cir.6/20/97), 697 So.2d 39, 43; see also La.Code Crim. P. art. 851(3). In evaluating whether the newly discovered evidence warrants a new trial, the test to be employed is not simply whether another trier of fact might render a different verdict, but whether the new evidence is so material that it ought to produce a verdict different from that rendered at trial. The trial court's denial of a motion for new trial will not be disturbed absent a clear abuse of discretion. State v. Henderson, 99-1945, pp. 15-16 (La.App. 1st Cir.6/23/00), 762 So.2d 747, 758, writ denied, 2000-2223 (La.6/15/01), 793 So.2d 1235.
In denying the motion for new trial, the trial court, in part, concluded that the admission of the presented testimony would not have produced a different verdict. The trial court specifically stated that the testimony was "so far outweighed by the other evidence that it would be incredible for me to say here today that it would likely produce a different verdict." After a careful review of the record, we conclude that the newly discovered evidence probably would have changed the verdict and that defendant is entitled to a new trial on the basis of the newly discovered evidence.
The testimony presented at the trial indicated that the victim was placed in a holding cell upon his arrest and abruptly lost consciousness. Dr. Donner, an expert in neurosurgery, testified that there was no reliable way to determine the number of blows to the head inflicted upon the victim. Dr. Donner also stated that he could not provide any information as to which blow caused the subdural hematoma. Dr. Donner indicated that a person who received the type of injury sustained by the victim herein (a two centimeter midline shift) would lose consciousness in less than one hour after the injury was inflicted. Dr. Donner stated, "A patient just simply isn't going to walk around with a two centimeter midline shift for very long before they lose consciousness." The following colloquy took place during the State's direct examination of Dr. Donner:
Q. How much would a patient become lethargic or drowsy or tired and, I mean, would they appear to be drowsy or tired after sustaining an injury like this?
A. Yes, but that may not be related to the subdural hematoma. That could just be due to the concussive force of the head injury. You know, I guess the best analogy is a boxer that gets knocked out. They may not have a subdural hematoma but they've taken a blow to the head and they'll briefly lose consciousness. So, I don't know that you *38 could immediately attribute that to a subdural hematoma.
During cross-examination, Dr. Donner further indicated that it was uncommon for a patient to be asymptomatic after sustaining the type of injury suffered by the victim. On re-direct examination, Dr. Donner testified that some people will have a "lucid interval" in which the person will be fairly asymptomatic for a short period of time before undergoing a fairly dramatic neurologic decline. Dr. Donner offered a period of two (2) hours as a generous estimation of how long this lucid interval could possibly last. However, Dr. Donner's testimony clearly indicated that generally, signs and/or symptoms of injury, including complaints of pain, nausea, and/or the inability to walk, are instant.
During the trial, Officer Carona testified that he did not abuse the victim or observe anyone injure or abuse the victim after his arrest. However, after transporting the victim, Officer Carona resumed street patrol and had no further contact with the victim. Thus, Officer Carona was not present when the victim lost consciousness or during the moments before. Lieutenant Blanchard, the officer present when the victim lost consciousness, did not testify at the trial. Moreover, the testimony of the officers present at the scene indicated that the victim had no apparent signs of injury or symptoms at the time of the arrest. When Lieutenant Berry arrived at the scene, the victim was standing in the parking lot. Lieutenant Berry did not question the defendant in reference to a fight that may have taken place, only in reference to the alleged burglary of defendant's residence. After speaking with the defendant, Lieutenant Berry advised Officer Carona to place the victim under arrest. During his testimony Lieutenant Berry stated, "[a]t the time when I advised him he was being placed under arrest, he told me that he didn't do anything and I didn't see any injuries or anything all (sic), no markings whatsoever." The following colloquy took place during the direct examination of Officer King's testimony by the defense,
Q. Did you see the alleged victim of the fight at the Mini Mart?
A. Yes, I did. He was standing in the parking lot and when we arrived there he was just standing in the parking lot by hisself (sic), so we give a call to headquarters saying everything was, you know, like, normal. And when we approached him, he was just standing there, you know, he was conscious and everything, he wasn't bleeding, didn't have no knots or anything like that.
Q. Did you speak with him?
A. Yes, I did. And he was fully conscious and everything.
Q. Did he volunteer anything about what had happened?
A. No, because I asked him, I said  I told Sgt. Berry, for a lot of guys supposed to have jumped on him, he ain't got no, like I say, no knots, he wasn't bleeding from anywhere or anything like that and he was fully conscious.
Q. And did you speak with him?
A. Yes, I did.
Q. Was he coherent?
A. Yes, he was.
* * *
Q. Did you ask Mr. Bayonne what had happened?
A. Yes, we did.
Q. What did you ask him?
A. I asked him whether he was involved in a fight. He told me no.
Officer Carona transported the victim to the police department. The victim did not complain of any discomfort and only requested something to drink.
*39 At the hearing on the motion for new trial, the defendant presented the testimony of Sheila Williams. Williams, as an employee of Thibodaux Regional Medical Center, interviewed the victim for a Victim of Crime Report for the hospital and the State of Louisiana. The victim was in ICU at the time of the interview. When questioned as to whether or not the contact took place before or after the victim's surgery, Williams indicated that the victim had not, to her knowledge, undergone surgery. She stated that the victim had "a lot of bruises and abrasions" and "blood stains" "[a]round the head," "his face, around his eyes." She further stated that she observed a lot of trauma to the victim's face. Williams stated that the victim was awake, but in and out of consciousness. Her testimony unequivocally indicates that the victim had periods of consciousness and coherence during her interview of him. According to Williams's testimony, the victim indicated that he had been beaten twice and repeatedly said, "the police, the police, the police." She indicated that the victim did not independently state that he was beaten at the police station, but when she asked whether the police beat him he answered positively. During cross-examination, the following colloquy took place:
A. All he was saying was the police and because he kept saying the same thing over and over then I asked him, "Mr. Baion, were you beaten by the police?" And I asked him did he understand that  I asked if he understood what I was saying blink his eyes or say yes.
Q. And what did he do?
A. He said, "Yes".
Q. Did he blink his eyes too?
A. He did that too.
Williams confirmed that she did not present this information to the defense until after the trial. It was stipulated that Mrs. Williams's name was not in pre-trial discovery or records that were provided to the defense attorney.
Upon motion for a new trial, the trial judge's duty is not to weigh the new evidence as though he were a jury determining guilt or innocence, rather his duty is the narrow one of ascertaining whether there is new material fit for a new jury's judgment. State v. Hammons, 536 So.2d 598, 600 (La.App. 1st Cir.1988). Herein, the testimony presented at trial indicated that victims of the type of injury suffered by the defendant normally have immediate symptoms and/or signs of injury. The officers present at the scene indicated that the victim had no symptoms or visible signs of injury prior to his arrest. The officers who testified at the trial were not present at the police station when the victim lost consciousness. According to Williams's testimony presented at the hearing on the motion for new trial, the victim indicated that he had been beaten on two separate occasions and repeatedly stated, "the police." The victim said, "yes" when asked whether the police beat him. We find Williams's testimony sufficient to raise a reasonable doubt as to whether or not the defendant actually inflicted the serious bodily injury suffered by the victim herein. Taking all of the above into consideration, the newly-discovered evidence is of such a nature that the outcome of the trial would most likely have been different had it been presented at trial.
Thus, the defendant met the requisite burden by showing that (1) the new evidence was discovered after trial, (2) the failure to discover the evidence at the time of trial was not caused by lack of diligence, (3) the evidence is material to the issues at trial, and (4) the evidence is of such a nature that it would probably have produced a different verdict. We find that *40 the trial court abused its discretion in denying the motion for new trial.
The second degree kidnapping and aggravated second degree battery charges were tried together. Because we have determined that the motion for new trial was improperly denied, and that a new trial should be held to allow additional evidence, which could perhaps add weight to defendant's credibility as to both charges, we grant the State's "Application for Rehearing and Clarification" solely to clarify that the convictions on both counts are reversed and the matter is remanded for a new trial on both counts. In all other respects, the State's application is denied.
Due to the foregoing finding, and our ruling on rehearing, we again pretermit discussion of the sentencing issues raised in assignment of error number three.

DECREE
For the foregoing reasons, we grant the State's application for rehearing and clarification in part. We reverse the convictions on counts one and two. We vacate the sentences and remand for a new trial on both counts.
STATE'S APPLICATION FOR REHEARING AND CLARIFICATION GRANTED IN PART; CONVICTIONS REVERSED ON COUNTS ONE AND TWO; SENTENCES VACATED; REMANDED FOR A NEW TRIAL ON BOTH COUNTS.
WHIPPLE, J., dissents in part and concurs in part for the following reasons: "I agree that rehearing should be granted. However, I would grant rehearing to AFFIRM both convictions and sentences, as I find no error by the trial court justifying the reversals."
NOTES
[1] This motion was raised on the second day of the trial and was denied after a brief hearing.
[2] The victim's last name is inconsistently spelled in the record as Bayonne or Baion.
[1] This motion was raised on the second day of the trial and was denied after a brief hearing.
[2] The victim's last name is inconsistently spelled in the record as Bayonne or Baion.