STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

KA 10-1289


STATE OF LOUISIANA

VERSUS

DAMIEN ORBRO


********


APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 06K0805C
HONORABLE ALONZO HARRIS, DISTRICT JUDGE


********


**BILLY HOWARD EZELL**
**JUDGE**


********


Court composed of Elizabeth A. Pickett, Billy Howard Ezell, and J. David Painter, Judges.


**AFFIRMED; REMANDED.**


**Earl B. Taylor**
**Jennifer Ardoin**
**Twenty-Seventh Judicial District Attorney**
**P. O. Drawer 1968**
**Opelousas, LA 70571-1149**
**(337) 948-3041**
**Counsel for Appellee:**
**State of Louisiana**

**Annette Fuller Roach**
**Louisiana Appellate Project**
**P. O. Box 1747**
**Lake Charles, LA 70602-1747**
**(337) 436-2900**
**Counsel for Defendant/Appellant:**
**Damien Orbro**

**EZELL, JUDGE.**

On April 12, 2006, the St. Landry Parish District Attorney charged Defendant, Damien Orbro, with two counts of assault with a dangerous weapon and with one count of second degree kidnapping. On July 29, 2010, Defendant was convicted of second degree kidnapping, in violation of La.R.S. 14:44.1. Thereafter, the sentencing court ordered Defendant to serve five years at hard labor; designated that the first two years would be served without benefit of probation, parole, or suspension of sentence; and gave Defendant credit for time served.

## STATEMENT OF FACTS

Dr. Mark Oliver, an emergency physician, was the first witness called by the State. The court accepted Dr. Oliver as an expert in emergency room medicine. On February 13, 2006, Dr. Oliver treated Myra Orbro at the Opelousas General emergency room. Mrs. Orbro complained primarily of an injury to her right back along with other injuries to her face, right chest, middle back, right knee, and left elbow. Mrs. Orbro reported that she had obtained the injuries when she was pushed, pulled, and threatened by her husband. Examination revealed that Mrs. Orbro was ambulatory; that she had an abrasion below her right eye; that she was anxious and upset; that, though there were no bruises in the area, she had mild tenderness below her left wingbone; that she had a minimal tenderness in the left trapezius area, and that she had a contusion on her right chest wall.

On cross-examination, Dr. Oliver stated that the abrasion did not require stitches. Dr. Oliver examined Mrs. Orbro's knee and found that it was not swollen and that it had a full range of motion. Although there were objective signs of some of her injuries, there were no objective signs of other injuries reported by Mrs. Orbro.

1

Myra Orbro Broussard was the prosecution's second witness. On February 13, 2006, Mrs. Broussard had been married to Defendant for twenty years, but she was in the process of separating from him; she has since remarried. At the time, Mrs. Broussard was living in the family home, and Defendant had been evicted therefrom. Mrs. Broussard worked at UPS; she usually went into work at 4:30 a.m. to load delivery trucks. She would also drive the trucks.

Mrs. Broussard reported that Defendant came into her place of business around 5:45 or 6:00 a.m. Although there are a lot of people around, they are usually in and out of their trucks because, when the conveyor belt was rolling, they were loading freight onto the delivery trucks. When Defendant walked in, he asked the young man across from Mrs. Broussard where she was, and the young man pointed her out. Mrs. Broussard saw Defendant when she walked out of her truck. He seemed really calm. Defendant asked her to speak with him, but Mrs. Broussard declined; she explained that she could not leave her truck when the conveyor belt was moving. She told him that they could probably get together if he called her later. Mrs. Broussard only took the time to speak to Defendant because he seemed calm and pleasant, and his eyes were clear. He was standing with his right hand behind his thigh.

Mrs. Broussard recalled that, before she finished speaking, Defendant grabbed her arm with his left hand and began to drag her out of the building. Though she pulled as hard away from him as she could and dragged her feet, he kept moving. While Defendant dragged her, Mrs. Broussard jerked her arm back as hard as she could. Mrs. Broussard's actions caused Defendant to lose his balance, and "the gun flew up." Defendant had the silver .32 caliber pearl-handled pistol he had inherited from his father. Defendant continued to hold the gun in his hand and pull Mrs. Broussard. At that point, Mrs. Broussard wrapped her arm and legs around a table

2

holding the UPS punch-in clock, but Defendant pulled her away. Mrs. Broussard also grabbed at paperwork and anything else she could to stop Defendant from pulling her outside. Mrs. Broussard asserted that she steadily resisted by yelling at him, by beating on his arm in an effort to make him let go of her, and by grabbing at objects such as the door knob. Defendant calmly pulled on her until she let go of the door handle. Mrs. Broussard fell, and Defendant dragged her from the building and onto the ground outside.

Mrs. Broussard related that, once she was outside, she saw a 1997 Toyota Camry parked across the street. The vehicle was running, but Mrs. Broussard did not notice if any of the doors were open. Mrs. Broussard knew the car engine was running because she could feel the heat and see the smoke. Defendant pulled Mrs. Broussard all of the way through the parking lot. She yelled and screamed for him to let her go. Defendant kept dragging her and cursing her: "Shut up B_tch"; "Get your _ss in the car"; "Get your _ss up"; "Get up you know"; "Get up Mother F_cker"; "Get your Mother F_cking _ss up B_tch"; and "Get in the car."

Defendant eventually picked Mrs. Broussard up by her neck and threw her against a small white building, which was located at the front of her workplace. Defendant again grabbed Mrs. Broussard by her neck; he then lifted her until her feet were off the ground. Defendant continued to curse Mrs. Broussard, instruct her to be quiet, and demand she get into the car. Mrs. Broussard could not breathe. Defendant pulled away from the wall and resumed dragging her.

Mrs. Broussard reported that, as Defendant resumed dragging her, her supervisor Mike Hebert walked outside. Mr. Hebert drew Defendant's attention by shouting for Defendant to leave the parking lot and to leave Mrs. Broussard alone because she did not want to go with him. Defendant turned around and put the gun

3

in Mr. Hebert's face. This enabled Mrs. Broussard to pull away and run. Defendant chased after Mrs. Broussard, caught her, and threw her into a fence across the road. She landed in the roadside ditch. Defendant then accused her of infidelity and repeatedly asserted that she had been "messing with" a cop. Mrs. Broussard denied the allegations, knelt in the ditch, and covered her face. Defendant held his gun to her head, so Mrs. Broussard thought he was planning to shoot her in the face. Ultimately, Defendant was frightened away by a passing eighteen-wheeler, that hit a pothole, and made a loud noise. Defendant got back into his car and drove away.

Mrs. Broussard explained that she did not want to leave with Defendant. She was frightened for her life. Mrs. Broussard repeated that Defendant held a gun to her head; he put it in her face as she crawled out of the ditch. Mrs. Broussard went to the emergency room; she had bruises all over, including a bruise to her right cheek. The bruises came out later; places turned blue after she left the hospital. She complained about her knee while she was at the hospital; it, too, later turned blue. Because of the bruising, the pain, and her swollen knee, Mrs. Broussard took a week off of work.

The third witness for the State was Mr. Hebert. At the time of the offense, Mr. Hebert was working for UPS as a Pre-Load Supervisor. He was in charge of loading seventeen trucks, and he had nine people working for him. Both Mr. Hebert and Mrs. Broussard were working around 6:00 a.m. on February 13, 2006. On that morning, Mr. Hebert was doing paperwork when Stuart Bob entered his office and hollered that "he" had Mrs. Broussard and that they were outside. Mr. Hebert did not know what was going on, so he ran outside with Mr. Bob. Once Mr. Hebert was outside, he saw that "he" had Mrs. Broussard behind his car, which was half on the parking lot and half on the street. Mr. Hebert had never seen the man before, and because it was dark, he could not really identify the man at trial.

4

Mr. Hebert said that, when he came outside, there was some shouting going on. Mrs. Broussard was actively resisting, and the man was physically forcing her to move.

Mr. Hebert testified that, as he approached the man from behind, the man had his hands on Mrs. Broussard by the car. Mr. Hebert told the man to let Mrs. Broussard go. The man and Mrs. Broussard struggled into the street before the man tackled Mrs. Broussard into the fence on the other side of the road. Mr. Hebert put his hands on the man, who turned around and pointed a gun at him. Mr. Hebert remembered Mrs. Broussard saying either to back off or that the man was going to shoot him. The man was between Mr. Hebert and Mrs. Broussard, so he was not in a position to see the man put the gun to her face.

On cross-examination, Mr. Hebert stated that he did not hear anything prior to Mr. Bob entering his office because it was pretty loud in the building. Mr. Bob told Mr. Hebert "that he had Myra[,] and he was dragging her outside." The car was in plain view if one walked out of the building and around a second structure. Mr. Hebert was focused on helping Mrs. Broussard, so he did not pay attention to who else was outside with them. When the man pointed the gun at Mr. Hebert, the man said, "You don't want none of this." Mr. Hebert backed off and said he was going to call the police.

The prosecution's fourth witness was Mr. Bob, who was working for UPS as a pre-loader on February 13, 2006. Around 6:00 a.m. that morning, he noticed a tall male non-employee enter the building. He had never seen the man before and could not recognize the person at the time of trial. Mr. Bob saw the man speak to Mrs. Broussard. At first, the conversation appeared to be calm. Then, as Mr. Bob walked out of his truck, he saw the man jerk Mrs. Broussard away from her area by the back

5

of her collar. The man took Mrs. Broussard outside the building's door, so Mr. Bob followed. Outside, Mr. Bob saw the man place Mrs. Broussard against a fence. Mr. Bob saw something shiny in the man's hand and heard him accuse Mrs. Broussard of cheating on him. He reported the matter to Mr. Hebert, who took charge of the situation. When Mr. Bob saw the shiny object in the man's hand, Mr. Bob went back inside the building. Mr. Bob thought that the shiny object was either a gun or a knife. Mr. Bob did not notice a vehicle. Mr. Bob was already back inside the building when the man left.

Chad Ray testified as the State's last witness in its case-in-chief. In February 2006, Mr. Ray worked part-time as a loader for UPS. Mr. Ray said that non-employees were not allowed on the UPS premises. Both he and Mrs. Broussard were working there at around 6:00 a.m. on February 13, 2006. Mr. Ray, who worked in the back of the building, heard doors slamming and someone screaming over the noise created by the fans. The fans in the building were very loud. Mr. Ray could not see Mrs. Broussard when she was screaming. Mr. Ray then followed everyone out of the building. Mr. Ray had never seen the man before, and he was unable to identify the man at trial.

Mr. Ray reported that, once outside, he observed Mrs. Broussard and a large man screaming, pushing, and shoving. Mr. Ray heard Mrs. Broussard say, "Go home," "I'm not cheating," "There's nothing going on," "I work all the time," "I take care of the house," "Go home," "You can't be here," "You'll get me in trouble," "You'll get me fired," and "Go home." Mr. Ray also heard the man speaking, "You're cheating," "You're making me look like a fool," "Why are you doing this to me," "Come ho[m]e with me now," "We're going to talk," and possibly, "If I can't have you, no one else can have you." Mostly, Mr. Ray remembered the man beating

6

Mrs. Broussard and pushing her down a hill into a gully where she hit her head on a pipe.

Mr. Ray explained that, because it was dark, he could not clearly see what the man had in his hand. Mr. Ray assumed it was a gun because everyone was running toward him, and they all said, "Gun." Mr. Ray approached the man and Mrs. Broussard in an effort to settle the matter. Though Mrs. Broussard told him to get away, Mr. Ray continued to say that it was okay and ask what was happening. The man made a gesture with the object he was holding, put it in his pocket, and left. The man had become nervous when Mr. Hebert announced that he was calling the police. Mrs. Broussard rolled into the ditch, and the man drove away in his car.

Defendant then testified in his own defense. Defendant explained that he had no contact with Mrs. Broussard since the incident. He was married to Mrs. Broussard over twenty years. His marriage had been in turmoil prior to the episode. Defendant went to UPS that morning because he was concerned about his son. Defendant parked his automobile on the side of the road near a fence because he did not want to block the delivery trucks when they were ready to leave. Defendant walked by Mrs. Broussard's car on the way inside the building and saw a negligee in the seat.

Defendant related that, when he entered a building, he asked a man standing nearby if he could speak to Mrs. Broussard. The man pointed out where Mrs. Broussard was working, so Defendant called Mrs. Broussard over to him. Defendant did not remember his response, but he recalled telling Mrs. Broussard that he could talk to her either inside or outside. Defendant then walked outside holding Mrs. Broussard's arm. She did not grab papers on the way out, and neither of them assaulted the other while in the building. Defendant claimed that Mrs. Broussard did not scream, but he related that they raised their voices during the argument. Mrs.

7

Broussard started fussing when Defendant told her what he "had to tell her." Defendant accused Mrs. Broussard of having an affair with a police officer, and Mrs. Broussard repeatedly denied the allegation. Defendant then pushed Mrs. Broussard into a fence. The men came after Mrs. Broussard called out, "Mike, Mike."

Defendant said he took out his gun after he pushed Mrs. Broussard and after she called out for Mr. Hebert. Defendant denied pointing it at them and explained that he "just had it" and told everyone to "[g]et back." Defendant did not remember anyone saying they were calling the police; he recalled the men telling him they were going to rush him. Defendant admitted that he had a shiny gun in his hand when the men approached him.

Defendant said he put the gun to his own head because he could not "see" what Mrs. Broussard was telling him: that she was not having an affair and that she loved him. Defendant believed Mrs. Broussard was lying and felt that there was no point in continuing the conversation. Defendant left when Mrs. Broussard told him that she loved him. He did not return to UPS that day because he had to go to the emergency room. Mrs. Broussard had already obtained a restraining order against him before the incident.

On cross-examination, Defendant said he did not enter UPS with his gun; instead, he retrieved it from his car when Mrs. Broussard yelled for Mr. Hebert. He saw the men coming toward him, and he grabbed the firearm from his floorboard. Defendant then said he pulled out the gun when Mr. Hebert said, "Let's rush him." Defendant did not recall whether this happened before or after he pushed Mrs. Broussard into the fence. Defendant maintained that he had not heard any screaming.

Defendant initially refused to answer yes or no when asked whether Mrs. Broussard voluntarily left the building with him before stating that he did not force

8

Mrs. Broussard: "No. I wasn't forcing her." When asked whether Mrs. Broussard left the building on her own, Defendant said, "We both walked out." Defendant then reported that they had "no actions" near the small structure once outside the larger building. Defendant denied ever pointing the gun at Mrs. Broussard or brandishing it at the other people. Defendant also denied Mrs. Broussard telling him that she could not speak at that time but would call him later.

The State then recalled Mrs. Broussard to rebut Defendant's testimony. Mrs. Broussard denied having a negligee in her car; she had her daughter's formal black dress on the backseat. She had been planning to take it to the cleaners because it was dry clean only, and there were white deodorant stains on the garment.

On cross-examination, the defense inquired whether Mrs. Broussard had photographed the dress or her injuries, and Mrs. Broussard responded that she had not. On redirect examination, Mrs. Broussard affirmed that she had bruises on her arms, her face, her knee, and her back. Mrs. Broussard also stated that she had scratches on her face. Moreover, Defendant put the gun to her head; he waved the gun at the other people present; he had the firearm inside the UPS building; he dragged and forcibly removed Mrs. Broussard from the UPS building; he put her up against the smaller building, and he then lifted her until her feet left the ground. Mrs. Broussard maintained that she had not gone outside willingly and that Defendant used force and violence to make her leave the UPS building to go to his car.

**ERRORS PATENT**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find that there is one error patent.

We note that there is no disposition for the offenses contained in Counts 1 and 2 of the bill of information; two counts of aggravated assault with a firearm. Louisiana Code of Criminal Procedure Article 819 provides: "If there is more than one count in an indictment, the jury must find a verdict as to each count, unless it cannot agree on a verdict as to a count." The Defendant was charged by bill of information with two counts of aggravated assault with a firearm and one count of second degree kidnapping. However, the Defendant proceeded to trial and was convicted on the second degree kidnapping charge only.

In response to an inquiry, the St. Landry Parish Clerk of Court's Office submitted an affidavit stating that no disposition of the remaining charges was found. Thus, the case is remanded for a disposition of the charges of aggravated assault with a firearm. *State v. Hypolite*, 04-1658, (La.App. 3 Cir. 6/1/05), 903 So.2d 1275, *writ denied*, 06-618 (La. 9/22/06), 937 So.2d 381.

## DISCUSSION

Defendant argues; "The evidence introduced at the trial of this case was insufficient to support the jury's verdict of guilty of second degree kidnapping beyond a reasonable doubt." Defendant points to discrepancies between the witness accounts and contests whether Mrs. Broussard was forced to accompany him, whether he was armed with a dangerous weapon or led Mrs. Broussard to reasonably believe that he was in possession of a such a weapon, whether Mrs. Broussard was harmed during the incident, and whether he had the requisite intent to kidnap Mrs. Broussard.

The State responds that Defendant's assignment of error is without merit. The prosecution points out that there is no set distance required to be traveled during a forcible seizure in order to prove kidnapping and asserts that the facts of the case show that Defendant forcibly moved Mrs. Broussard from one environment, inside

10

the UPS building, to another, a fence across both the parking lot and the street from the UPS building. The State adds that the evidence presented at trial showed that the victim was injured during the altercation; she suffered pain caused by numerous bruises, contusions, and swelling. Also, the prosecution points out that Defendant's gun became visible while Mrs. Broussard was resisting inside the building, and other witnesses saw the firearm in Defendant's possession once they were outside of the building. The State continues that many of the inconsistencies in the witnesses' testimonies pointed out by the defense are not actually inconsistencies.

It is not the function of the appellate court to reassess credibility of witnesses or reweigh evidence:

> [The] due process, rational fact finder test of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), does not permit a reviewing court to substitute its own appreciation of the evidence for that of the fact finder or to second guess the credibility determinations of the fact finder necessary to render an honest verdict. A reviewing court may intrude on the plenary discretion of the fact finder "only to the extent necessary to guarantee the fundamental protection of due process of law."

*State v. Calloway*, 07-2306, p. 10 (La. 1/21/09), 1 So.3d 417, 422 (citations omitted). "The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness[.]" *State v. Higgins*, 03-1980, p. 17 (La. 4/1/05), 898 So.2d 1219, 1232, *cert. denied*, 546 U.S. 883, 126 S.Ct. 182 (2005). "Credibility determinations are within the sound discretion of the trier of fact and will not be disturbed unless clearly contrary to the evidence." *State v. Marshall*, 04-3139, p. 9 (La. 11/29/06), 943 So.2d 362, 369, *cert. denied*, 552 U.S. 905, 128 S.Ct. 239 (2007).

The Louisiana Supreme Court has discussed the standard of review for evaluating the sufficiency of the evidence on appeal:

11

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. A reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the *Jackson* standard of review. It is not the function of an appellate court to assess credibility or re-weigh the evidence.

*State v. Macon*, 06-481, pp. 7-8 (La. 6/1/07), 957 So.2d 1280, 1285-86 (citations omitted).

"Second degree kidnapping is the [forcible seizing and carrying of any person from one place to another] wherein the victim is: (3) Physically injured or sexually abused; . . . (5) Imprisoned or kidnapped when the offender is armed with a dangerous weapon . . . ." La.R.S. 14:44.1. When the record is viewed in the light most favorable to the prosecution, it shows that Defendant, armed with a pistol, forced his estranged wife from her place of business, through the parking lot, and across the street. Defendant then pointed the gun at Mrs. Broussard when she continued her efforts to escape. During the struggle, Mrs. Broussard received bruises and at least one abrasion. Mrs. Broussard reported that her injuries became more noticeable after her visit to the emergency room and caused her to miss a week's worth of work.

In *State v. Coleman*, 04-758, (La.App. 1 Cir. 3/24/05), 918 So.2d 23, the first circuit found sufficient evidence to support the defendant's conviction for second degree kidnapping where the victim was forced out of a building, into a parking lot, and, thereafter, struck by the defendant. The defendant, who was in the process of moving, returned to her old residence to find that it had been burglarized while she was away. The defendant's neighbor told her that the victim had been seen exiting

12

the apartment. In response, the defendant grabbed a baseball bat and went looking for the victim. She confronted him, struck him in the leg with the bat, and demanded that he return her belongings. The victim agreed to return the defendant's possessions; he fled into a convenience store when the defendant again moved to strike him with the bat. At that time, the defendant and others followed the victim to the store. *Coleman*, 918 So.2d at 26. In accordance with the defendant's request, two of the others went inside the store and forcefully removed the victim. *Id*. Once the victim was outside, several people in the crowd attacked the victim. *Id*. The victim fell to the ground, and the defendant again hit him with the baseball bat. *Id*. Though the victim initially showed no signs of injury, he developed a large blood clot on the surface of his brain. The resulting brain damage caused permanent physical impairment. After concluding that there was sufficient evidence to support the defendant's second degree kidnapping conviction, the first circuit reversed the conviction and sentence upon finding that the trial court erred in denying the defendant's motion for new trial. Thereafter, in *State v. Coleman*, 05-1617, (La. 6/29/07), 959 So.2d 465, 473-74, the supreme court reversed the appellate court's ruling and reinstated Defendant's conviction and sentence for second degree kidnapping.

In *State v. Gauthier*, 04-1608, (La.App. 3 Cir. 11/2/05), 916 So.2d 314, *writ denied*, 06-465 (La. 9/22/06), 937 So.2d 378, this court found sufficient evidence to support the defendant's second degree kidnapping conviction. The evidence at trial showed that the defendant, while armed with a gun, persuaded his wife to leave their residence and go to another location. On the way to the second location, the defendant drove with the gun in his lap. Once at that location, he aimed the gun at her and told her that he would shoot her if she ran.

13

Thus, under the *Coleman* decision, the facts of the instant case are sufficient to prove that Defendant forcibly seized and carried Mrs. Broussard from one place to another. Also, under the *Gauthier* decision, the facts are sufficient to show that Defendant was armed with a dangerous weapon when he forcibly seized and carried Mrs. Broussard from one place to another. Therefore, the State introduced sufficient evidence to support Defendant's second degree kidnapping conviction.

Accordingly, Defendant's assignment of error is without merit.

## CONCLUSION

Defendant's conviction and sentence for second degree kidnapping are affirmed. This case is remanded for disposition of the charges of aggravated assault with a firearm.

**AFFIRMED; REMANDED**.